**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ---------------------------------------------------- | x | |
| **In re** | : | **Chapter 11** |
| | : | |
| **NRG ENERGY, INC., et al.,** | : | |
| | : | **Case No. 03-13024 (PCB)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| ---------------------------------------------------- | x | |

## DEBTORS' JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Proposed Counsel to the Debtors and Debtors in
Possession

Dated: May 14, 2003

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINITIONS AND CONSTRUCTION OF TERMS..................................................................1
1.1    Definitions.................................................................................................................................1
1.2    Interpretation; Application of Definitions and Rules of Construction ............................................11
1.3    Defined Terms from Term Sheet or Plan Support Agreement.......................................................11

ARTICLE II. DESCRIPTION OF SECURITIES TO BE ISSUED UNDER THE PLAN .................................11
2.1    New NRG Senior Notes ..............................................................................................................11
2.2    New NRG Common Stock............................................................................................................11
2.3    Xcel Note ..................................................................................................................................11
2.4    Exit Facility................................................................................................................................11

ARTICLE III. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL
        COMPENSATION AND REIMBURSEMENT CLAIMS, PRIORITY TAX CLAIMS AND
        CONVENIENCE CLAIMS ................................................................................................12
3.1    Administrative Expense Claims ...................................................................................................12
3.2    Professional Compensation and Reimbursement Claims; Fee Applications.....................................12
3.3    Priority Tax Claims.....................................................................................................................12
3.4    Convenience Claims ...................................................................................................................12

ARTICLE IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND  EQUITY INTERESTS
        AND VOTING RIGHTS....................................................................................................12
4.1    Summary ...................................................................................................................................12
4.2    Payment of Interest ...................................................................................................................14
4.3    Allowance of Bank Group and Note Claims..................................................................................15
4.4    Timing of Payments and Distributions..........................................................................................15
4.5    Class 1 - Unsecured Priority Claims .............................................................................................15
4.6    Class 2 - Convenience Claims......................................................................................................15
4.7    Class 3 - Secured Claims against Noncontinuing Debtor Subsidiaries. ...........................................15
4.8    Class 4 - Intentionally Omitted. ..................................................................................................16
4.9    Class 5 - Miscellaneous Secured Claims.......................................................................................16
4.10   Class 6 – NRG Unsecured Claims, Including NRG Rejected Guaranty Claims...................................16
4.11   Class 7 - PMI Unsecured Claims. ................................................................................................16
4.12   Class 8 - Unsecured Noncontinuing Debtor Subsidiary Claims.......................................................16
4.13   Class 9 - NRG Intercompany Claims.............................................................................................16
4.14   Intentionally Omitted. ................................................................................................................17
4.15   Class 11 - NRG Old Common Stock. ...........................................................................................17
4.16   Class 12 - PMI Old Common Stock...............................................................................................17
4.17   Class 13 - Securities Litigation Claims..........................................................................................17
4.18   Class 14 - Noncontinuing Debtor Subsidiary Common Stock. ........................................................17

ARTICLE V. NRG REALLOCATION PROCEDURES ...............................................................................17
5.1    Reallocation Procedures..............................................................................................................17

ARTICLE VI. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN
        AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED
        ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS...........................18
6.1    Voting of Claims and Equity Interests ..........................................................................................18
6.2    Procedural Consolidation ............................................................................................................19
6.3    Elimination of Vacant Classes .....................................................................................................19
6.4    Nonconsensual Confirmation.......................................................................................................19
6.5    Method of Distributions Under the Plan. ......................................................................................19
6.6    Objections to and Resolution of Administrative Expense Claims and Claims ...................................20

i

6.7    Payment of Other Fees. ...................................................................................................20
6.8    Cancellation of Existing Securities and Agreements ........................................................21
6.9    Impairment Controversies ................................................................................................21
6.10   Confirmation Without Acceptance by All Impaired Classes .............................................21

**ARTICLE VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .............................**21**
7.1    Assumption, Assignment or Rejection of Executory Contracts and Unexpired Leases. ....21
7.2    Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness ...........22
7.3    Approval of Assumption, Assumption and Assignment or Rejection of Executory Contracts and
     Unexpired Leases .............................................................................................................22
7.4    Cure of Defaults ..............................................................................................................22
7.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected
     Pursuant to the Plan ........................................................................................................22
7.6    Retiree Benefits ...............................................................................................................22

**ARTICLE VIII. IMPLEMENTATION OF THE PLAN** .............................................................**22**
8.1    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ...........22
8.2    Corporate Governance, Directors, Officers, and Corporate Action. ..................................23
8.3    Effectuating Documents and Further Transactions ...........................................................24
8.4    NRG Guaranty Obligations ..............................................................................................24
8.5    HSR Compliance .............................................................................................................24
8.6    Vesting of Assets .............................................................................................................24
8.7    Liquidation of XEL Stock. ...............................................................................................24
8.8    [Liquidation of NRG FinCo. ............................................................................................24
8.9    Substantive Consolidation of NRG and PMI. ..................................................................24
8.10  Severability. ....................................................................................................................25
8.11  Additional Entities ..........................................................................................................25

**ARTICLE IX. THE XCEL SETTLEMENT** .............................................................................**25**
9.1    Implementation of Xcel Settlement ..................................................................................25
9.2    Injunctions. .....................................................................................................................25
9.3    [RELEASES ....................................................................................................................26

**ARTICLE X. DISPUTED CLAIMS RESERVE** .......................................................................**27**
10.1  Funding of the Disputed Claims Reserve ..........................................................................27
10.2  ANZ Letter of Credit Reserve ..........................................................................................27
10.3  Property Held in Disputed Claims Reserve; Dividends and Distributions ..........................27
10.4  Recourse. .........................................................................................................................27

**ARTICLE XI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ...............................**28**
11.1  Prosecution of Objections to Claims. ...............................................................................28
11.2  Treatment of Disputed Claims .........................................................................................28
11.3  Estimation of Claims .......................................................................................................28
11.4  Distributions on Account of Disputed Claims Once Allowed .............................................28
11.5  Tax Requirements for Income Generated by Disputed Claims Reserve ..............................28

**ARTICLE XII. CONFIRMATION AND EFFECTIVENESS OF THE PLAN** ............................**29**
12.1  Conditions Precedent to Confirmation ..............................................................................29
12.2  Conditions Precedent to Effectiveness ..............................................................................30
12.3  Effect of Failure of Conditions ........................................................................................30
12.4  Waiver of Conditions ......................................................................................................31

**ARTICLE XIII. EFFECT OF CONFIRMATION OF PLAN**.............................................................................31
13.1    Term of Bankruptcy Injunction or Stays.................................................................................31
13.2    Claims Extinguished ..............................................................................................................31
13.3    Discharge of Debtors .............................................................................................................31
13.4    Injunction ...............................................................................................................................31

**ARTICLE XIV. RETENTION OF JURISDICTION**....................................................................................32

**ARTICLE XV. MISCELLANEOUS PROVISIONS**.....................................................................................32
15.1    Effectuating Documents and Further Transactions ...............................................................32
15.2    Exemption from Transfer Taxes ............................................................................................32
15.3    Exculpation and Limitation of Liability.................................................................................33
15.4    INJUNCTION RELATED TO RELEASES AND EXCULPATION ...................................33
15.5    Committee Termination .........................................................................................................33
15.6    Fees and Expenses .................................................................................................................33
15.7    Payment of Statutory Fees .....................................................................................................33
15.8    Amendment or Modification of the Plan................................................................................33
15.9    Revocation or Withdrawal of the Plan ..................................................................................33
15.10   Binding Effect.........................................................................................................................34
15.11   Notices ....................................................................................................................................34
15.12   Governing Law .......................................................................................................................35
15.13   Withholding and Reporting Requirements.............................................................................35
15.14   Exhibits/Schedules .................................................................................................................35
15.15   Plan Supplement .....................................................................................................................35
15.16   Subrogation Rights.................................................................................................................36

NRG Energy, Inc., a Delaware corporation ("NRG"), NRG Power Marketing Inc., a Delaware corporation ("PMI"), NRG Finance Company I LLC, a Delaware limited liability company ("NRG FinCo"), NRGenerating Holdings (No. 23) B.V., a Netherlands private company with limited liability ("NRGenerating"), NRG Capital LLC, a Delaware corporation ("NRG Capital"), as debtors and debtors-in-possession (collectively, the "Debtors"), propose the following joint plan of reorganization for the Debtors under section 1121(a) of the Bankruptcy Code. Exhibit A annexed to the Plan is a Term Sheet (as defined below) and Exhibit B annexed to the Plan is a Plan Support Agreement (as defined below), both of which reflect the terms of an agreement and settlement among Xcel (NRG's parent company), an ad hoc committee of NRG's Noteholders (as defined below) and the Global Steering Committee (as defined below) of the holders of the NRG Unsecured Revolver Claims, NRG Letter of Credit Claims or the NRG FinCo Secured Revolver Claims (all as defined below) among NRG and such parties. The Term Sheet and the Plan Support Agreement are incorporated herein by reference as if set forth fully herein, and shall be implemented pursuant to this Plan. In the event and to the extent there is any inconsistency between this Plan and the Term Sheet, and such inconsistency relates to the rights, benefits and obligations of Xcel under the Xcel Settlement, the terms and provisions of the Term Sheet shall be controlling and shall supersede the terms of the Plan.

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION OF TERMS

1.1     *Definitions*.  As used herein, the following terms have the respective meanings specified below:

*Administrative Expense Claims* means all Claims against the Debtors constituting a cost or expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including all actual and necessary costs and expenses of preserving the Estates of the Debtors, all actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses, all cure amounts owed in respect of executory contracts and unexpired leases assumed by the Debtors to the extent that the same are not paid or discharged in the context of a sale or disposal of assets, all Professional Compensation and Reimbursement Claims to the extent allowed under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code.

*Affiliate* has the meaning set forth in section 101(2) of the Bankruptcy Code; *provided, however,* that such definition shall not include Xcel or any of Xcel's affiliates, except for the Debtors and the Debtors' direct and indirect subsidiaries.

*Allowed* means, with reference to any Claim against or Equity Interest in the Debtors, (i) any Claim which has been listed by the Debtors in the Debtors' Bankruptcy Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and for which no contrary proof of claim or objection to claim has been timely filed; (ii) any Claim or Equity Interest allowed hereunder; (iii) any Claim or portion thereof, or Equity Interest which is not Disputed; (iv) any Claim or Equity Interest that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or under the Plan; or (v) any Claim or Equity Interest which, if Disputed, has been Allowed by Final Order; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered *Allowed Claim* hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, *Allowed Administrative Expense Claim* or *Allowed Claim* shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

*Amended and Restated Certificate of Incorporation* shall have the meaning set forth in Section 8.2 of this Plan.

*ANZ Letter of Credit Reserve* shall have the meaning set forth in Section 10.2 of this Plan.

*Ballot* means the ballot, in form and substance satisfactory to Xcel, the Committee and the Global Steering Committee, distributed to each holder of an Impaired Claim or Equity Interest on which such holder shall indicate among other things, acceptance or rejection of the Plan and the Release Election.

*Bank Group* means the Persons identified on <u>Schedule 1-C</u> to the Plan Support Agreement attached hereto.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time.

*Bankruptcy Court* means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference under section 157 of title 28 of the United States Code, the Bankruptcy Court unit of such District Court, or any court having competent jurisdiction to hear appeals or certiorari petitions therefrom, or any successor thereto that may be established by an act of Congress or otherwise, and that has competent jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as amended from time to time, as applicable to the Chapter 11 Case.

*Bar Date* means the date described in Section 7.5 hereof or any bar date for the filing of Claims established by a separate order of the Bankruptcy Court in connection with the Chapter 11 Case.

*Business Day* means any day other than a Saturday, a Sunday or any other day on which commercial banks in the State of New York are required or authorized to close by law or executive order.

*Cash* means legal tender of the United States of America.

*Cash Refund* means the amount of any Cash refund of taxes, including any interest paid thereon, to be generated by the carryback of the Worthless Stock Deduction in whole or in part to any taxable year prior to the Loss Year.

*Cause of Action* means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

*Chapter 11 Case* means, collectively, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on May __, 2003 and administratively consolidated under chapter 11 Case No. _____.

*Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Claims Agent* means Kurtzman Carson Consultants LLC.

*Claims Objection Deadline* means the deadline for filing objections to Claims as set forth in Section 11.1(a) of the Plan.

*Class* means a category of holders of Claims against or Equity Interests in the Debtors as set forth in Articles IV and V of the Plan.

*Clerk* means the clerk of the Bankruptcy Court.

*Collateral* means any property or interest in property of the Estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable law.

*Committee* means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

*Common Stock* means the current issued and outstanding shares of the common stock of NRG Energy, Inc., all of which is held by Xcel.

*Confirmation Date* means the date on which the Clerk enters the Confirmation Order on the Bankruptcy Court's docket.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

*Contested*, when used with respect to a Claim, means a Claim (i) that is not listed in the Schedules; (ii) that is listed in the Schedules, but was scheduled as (a) disputed, contingent, or unliquidated (whether in whole or in part); or (b) undisputed, liquidated, and not contingent if a proof of claim has been filed with the Bankruptcy Court (but only to the extent the proof of claim is of a different nature than (i.e., secured, unsecured, priority, administrative, etc.), or exceeds the amount of, the Claim listed in the Schedules); or (iii) as to which an objection has been filed before the Claims Objection Deadline; *provided, however*, that a Claim that is Allowed by Final Order or pursuant to the Plan shall not be a Contested Claim.

*Convenience Claims* means all Unsecured Claims against any Debtor that would be included in either Class 6 or Class 7 exclusive of Claims held by Noteholders or members of the Bank Group, but with respect to each such Claim, the applicable Claim either (i) is equal to or less than $50,000.00 or (ii) is reduced to $50,000.00 pursuant to an election by such holder made in the Ballot.

*Debtors* means NRG, NRGenerating, PMI, NRG Capital and NRG FinCo.

*Debtors' Bankruptcy Schedules* means the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs filed in this Chapter 11 Case by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended from time to time.

*Disbursing Agent* means any Entity in its capacity as a disbursing agent under Section 6.5(a) hereof.

*Disclosure Statement* means the Disclosure Statement for the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for the Debtors, proposed by the Debtors, dated as of _____, 2003, including all exhibits, supplements, appendices and schedules thereto, as approved on _____, 2003 by the Bankruptcy Court pursuant to the Disclosure Statement Order and all notifications thereto.

*Disclosure Statement Order* means the order of the Bankruptcy Court entered pursuant to section 1125 of the Bankruptcy Code approving the Disclosure Statement.

*Disputed* means, with respect to any Claim or Interest, any Claim or Interest to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been settled, waived, withdrawn or determined by a Final Order. A Claim that is Disputed by the Debtors as to its amount only shall be deemed Allowed in the amount the Debtors admit owing, if any, and Disputed as to the excess.

*Disputed Claims Reserve* means the reserve holdings, if any, of Reserved Cash, Reserved Shares, and Reserved Notes established pursuant to Article X, which reserve will be maintained in trust for holders of Allowed Claims in Class 6 or Class 7 and will not constitute property of any Reorganized Debtors.

*Distribution Date* means, with respect to a particular Claim, the later of the Effective Date or the date on which such Claim becomes an Allowed Claim.

*Distribution Record Date* means 15 days prior to the Effective Date.

*Effective Date* means the date on which the conditions specified in Section 12.2 hereof have been satisfied or waived pursuant to Section 12.4 of this Plan.

*Elected Cash Amounts* means an amount of Cash not less than [$30,000.00], which an Eligible Reallocation Creditor is entitled to receive as a distribution in satisfaction of an Allowed Claim pursuant to the Plan.

*Elected Debt Amounts* means an amount not less than [$40,000.00] of New NRG Senior Notes, which an Eligible Reallocation Creditor is entitled to receive as a distribution in satisfaction of an Allowed Claim pursuant to the Plan.

*Elected Equity Amounts* means an amount of shares nominated by the Eligible Reallocation Creditor of New NRG Common Stock, which an Eligible Reallocation Creditor is entitled to receive in satisfaction of an Allowed Claim as a distribution pursuant to the Plan.

*Electing Cash and Debt Recipient* means an Eligible Reallocation Creditor that has elected on its Ballot, with respect to its Allowed Claims in Class 6 or Class 7, to offer to reduce its initial allocation of some or all of its New NRG Common Stock in return for specified Cash or New NRG Senior Notes consideration, in accordance with the reallocation procedures set forth in Article V herein.

*Electing Cash and Debt Recipient Election* means the election available to Eligible Reallocation Creditors on the Ballot to reduce its initial allocation of some or all of its New NRG Common Stock in return for specified Cash or New NRG Senior Notes consideration, in accordance with the reallocation procedures set forth in Article V herein.

*Electing Equity Recipient* means an Eligible Reallocation Creditor that has elected on its Ballot, with respect to its Allowed Claims in Class 6 or Class 7, to offer to receive additional New NRG Common Stock in exchange for the Cash or New NRG Senior Notes which it would otherwise have received under the Plan, all pursuant to reallocation procedures set forth in Article V herein.

*Electing Equity Recipient Election* means the election available to Eligible Reallocation Creditors on the Ballot to offer to receive additional New NRG Common Stock in exchange for the Cash or New NRG Senior Notes which it would otherwise have received under the Plan, all pursuant to reallocation procedures set forth in Article V herein.

*Eligible Reallocation Creditors* means holders of Allowed Class 6 or Class 7 Claims.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Environmental Claims* means all Claims against the Debtors arising from (i) any accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or other order, restriction or direction (conditional or otherwise) by any Governmental Entity or any other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or intangible property damage, Punitive Damages, damage to the environment, nuisance, pollution, contamination or other adverse effect on the environment or costs (to the extent recoverable under applicable non-bankruptcy law) of any Governmental Entity related thereto, in each case resulting from or based upon (a) the existence, or the continuation of the existence, of a release of (including, but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise in, into or onto the environment (including, but not limited to, the air, soil, surface water or groundwater) at, in, by, from or related to any property (including any vessels or facilities of the Debtors) presently or formerly owned, operated or leased by the Debtors or any activities or operations thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious material, substance, waste, pollutant or contaminant in connection with any property presently or formerly owned, operated or leased by the Debtors or its operations or facilities, or (c) the violation or alleged violation, of any environmental law, order or environmental permit or license of or from any Governmental Entity relating to environmental matters connected with any property presently or formerly owned, operated or leased by the Debtors (including any FERC license pertaining to any environmental matter); and (ii) any claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtors by any third

4

party, where such indemnification or contribution claim of such third party is based on a claim against such third party that if asserted directly against the Debtors would be a claim included with the immediately preceding clause (i); *provided, however,* that Environmental Claims shall not include (A) any Claims fully settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtors for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments (which Claims are classified as General Unsecured Claims), (B) Tort Claims, (C) Securities Litigation Claims, or (D) Pending Litigation Claims.

*Equity Interest* or *Interest* means any share of Common Stock or other instrument evidencing an ownership interest in the Debtors, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest or any legal, equitable, or contractual Claim arising therefrom, including Claims arising from rescission of the purchase or sale of an Equity Interest, for damages arising from the purchase or sale of an Equity Interest, or for reimbursement or contribution on account of such Claim.

*Estate* means the estate of a Debtor created pursuant to section 541 of the Bankruptcy Code.

*Estimated Payment Reduction* means the reduction of any estimated payments of federal income tax liability in the Loss Year or any subsequent year, which reduction may be made (or not made) by Xcel in its sole discretion.

*Exit Facility* means the facility described in Section 2.4 of the Plan.

*Face Amount* means, with respect to all Disputed Claims, either (i) the full stated amount claimed by the holder of such Claim in any proof of Claim filed by the Bar Date or otherwise deemed timely filed under applicable law, if the proof of Claim specifies only a liquidated amount; (ii) if no proof of Claim is filed by the Bar Date or otherwise deemed timely filed under applicable law, the full amount of the Claim, provided that such amount is not Disputed, contingent or unliquidated; or (iii) if no proof of Claim has been filed by the Bar Date or has otherwise been deemed timely filed under applicable law or if the proof of Claim specifies an unliquidated amount, the amount of a Claim acknowledged by the applicable Debtor or Reorganized Debtor in any objection filed to such Claim as an undisputed, noncontingent and liquidated Claim, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, proposed by the Debtors or established by the Reorganized Debtors following the Effective Date.

*Fee Application* means an application of a Professional Person or other request for compensation or reimbursement of expenses incurred in connection with the Chapter 11 Cases.

*FERC* means the Federal Energy Regulatory Commission.

*General Unsecured Claims* means any unsecured claim not included in any other Class including (a) Claims against the Debtors arising from the rejection of executory contracts and unexpired leases as defined in section 365 of the Bankruptcy Code; (b) Claims against the Debtors relating to prepetition litigation; and (c) Claims against the Debtors by the Debtors' vendors, suppliers and service providers.

*Global Steering Committee* means, as of the Petition Date, the Persons identified as such on <u>Schedule 1-C</u> to the Plan Support Agreement attached hereto, being members of the Bank Group together with any replacements, successors or assigns from time to time a member of the Global Steering Committee.

*Governmental Entity* has the meaning set forth for a governmental unit in section 101(27) of the Bankruptcy Code.

*G-Reorganization* means a contribution of assets by NRG to New NRG, the issuance of New NRG Common Stock and New NRG Senior Notes to NRG, and the subsequent transfer of New NRG Common Stock and New NRG Senior Notes by NRG to Creditors of the Debtors, in accordance with the Plan and section 368(a)(1)(G) of the Internal Revenue Code of 1956, as amended.

*HSR* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

*Impaired* means any Class of Claims against or Equity Interests in the Debtors that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Loss Year* means the year in which the Effective Date occurs.

*Master Ballot* means the ballot to be completed by the trustees for the Notes or the beneficial owners of the Notes.

*Miscellaneous Secured Claims* means all Secured Claims other than Class 3 Claims (Secured Claims against Noncontinuing Debtor Subsidiaries).

*New NRG* means a corporation that may be incorporated under the laws of the State of Delaware in order to effect a G-Reorganization.

*New NRG Common Stock* means all of the shares of common stock, par value $0.01, of Reorganized NRG authorized pursuant to Article VIII of the Plan, as set forth in Article II of the Plan.

*New NRG Senior Notes* means the Notes described in Article II of the Plan.

*New NRG Senior Note Indenture* means that certain indenture substantially in the form as shall be filed with the Bankruptcy Court as part of the Plan Supplement.

*Noncontinuing Debtor Subsidiaries* means NRGenerating, NRG Capital and NRG FinCo.

*Nondebtor Subsidiaries* means the NRG Subsidiaries that are not Debtors.

*Note Claims* means the obligations of NRG under or in respect of any Notes.

*Noteholders* means all holders of Notes from time to time.

*Notes* means NRG's public notes identified on Exhibit F attached hereto.

*NRG Equity Undertaking* means the NRG Equity Undertaking, by and among NRG, NRG FinCo and Credit Suisse First Boston, as Administrative Agent, dated as of May 8, 2001.

*NRG FinCo Assets* means those certain assets of NRG FinCo listed on Exhibit H attached hereto.

*NRG FinCo Lenders* means those certain lenders party to the NRG FinCo Secured Revolver Agreement.

*NRG FinCo Priority Claim* means any Priority Claim against NRG FinCo.

*NRG FinCo Secured Revolver* means all loans and other financial accommodations made to NRG FinCo pursuant to the NRG FinCo Secured Revolver Agreement.

*NRG FinCo Secured Revolver Agreement* means the revolving credit agreement entered into by and among NRG FinCo, Credit Suisse First Boston and certain other lenders party thereto and NRG Audrain Generation LLC, LSP-Nelson Energy, LLC, LSP-Pike Energy, LLC and NRG Turbine LLC, as sub-borrowers, as of May 8, 2001 with the purpose of financing certain domestic construction projects of the Debtors, together with all amendments, modifications, renewals, restatements, substitutions and replacements thereof and all documents, agreements or instruments related thereto, including, but not limited to, the NRG Equity Undertaking.

*NRG FinCo Secured Revolver Claims* means collectively, NRG FinCo Secured Revolver Secured Claims, NRG FinCo Secured Revolver Recourse Claims and NRG FinCo Secured Revolver Deficiency Claims.

*NRG FinCo Secured Revolver Deficiency Claim* means a General Unsecured Claim arising under the NRG FinCo Secured Revolver Agreement as a result of the Allowed Amount of an NRG FinCo Secured Revolver Secured Claim exceeding the value of the Collateral securing such NRG FinCo Secured Revolver Secured Claim.

*NRG FinCo Secured Revolver Other Collateral* means, other than the NRG FinCo Assets, all Collateral of NRG Subsidiaries securing obligations under the NRG FinCo Secured Revolver Agreement.

*NRG FinCo Secured Revolver Recourse Claim* means all obligations of NRG arising under the NRG FinCo Secured Revolver Agreement.

*NRG FinCo Secured Revolver Secured Claim* means all Secured Claims arising under the NRG FinCo Secured Revolver Agreement.

*NRG FinCo Statutory Lien Claims* means Claims against NRG FinCo secured by Statutory Liens.

*NRG FinCo Unsecured Claim* means any General Unsecured Claim against NRG FinCo.

*NRG Guaranty Obligations* means a claim against NRG pursuant to a guaranty issued by NRG for the benefit of its subsidiaries attached hereto as Exhibit____.

*NRG Intercompany Claim* means a claim against a Debtor or any of its subsidiaries by a Debtor or any of its subsidiaries, excluding NRG Guaranty Obligations.

*NRG Letter of Credit Claim* means all obligations of NRG under the NRG Letter of Credit Facility Agreement pursuant to or arising under the NRG Letter of Credit Facility.

*NRG Reinstated Guaranty Obligations* shall mean any NRG Guaranty Obligation that NRG will reinstate in its entirety, without impairment or modification, as of the Effective Date. The NRG Reinstated Guaranty Obligations are set forth in Exhibit____ attached hereto and incorporated herein by reference; provided further any such reinstatement is dependent upon a consensual restructuring of the underlying project debt to which such NRG Guaranty Obligation relates.

*NRG Rejected Guaranty Obligations* shall mean any NRG Guaranty Obligation that is not an NRG Reinstated Guaranty Obligation. The NRG Rejected Guaranty Obligations are set forth on Exhibit____ attached hereto and incorporated herein by reference.

*NRG Subsidiaries* means NRG's direct and indirect majority-owned subsidiaries.

*NRG Unsecured Claim* means any General Unsecured Claim against NRG, including NRG Unsecured Revolver Claims, NRG Letter of Credit Claims, NRG FinCo Secured Revolver Recourse Claims, Note Claims, the debenture portion of NRZ Equity Units, Environmental Claims, Pending Litigation Claims, Tort Claims, Workers' Compensation Claims and NRG Rejected Guaranty Obligations.

*NRG Unsecured Revolver* means all loans and other financial accommodations made pursuant to the NRG Unsecured Revolver Agreement.

*NRG Unsecured Revolver Agreement* means that certain 364-Day Revolving Credit Agreement dated as of March 8, 2002 among NRG, the financial institutions party thereto, ABN Amro Bank N.V., as administrative agent, Salomon Smith Barney, Inc., as syndication agent, Barclays Bank PLC, as co-syndication agent, and The Royal Bank of Scotland PLC, and Bayerische Hypo-und Vereinsbank AG, New York Branch, as co-documentation agents, as amended, supplemented, restated or modified from time to time, together with all documents, agreements or instruments related thereto.

*NRG Unsecured Revolver Claim* means a Claim against NRG pursuant to the NRG Unsecured Revolver Agreement.

*Old Common Stock of...* or *Old Common Stock* means, when used with reference to a particular Debtor or Debtors, the Common Stock, the non-debenture portion of NRZ Equity Units, all membership interests, all partnership interests or similar ownership interests, including options, warrants or rights to acquire any such interests, issued by such Debtor or Debtors and outstanding immediately prior to the Petition Date.

*Pending Litigation Claims* means all Claims against the Debtors that are asserted in litigation pending against the Debtors and listed in a schedule to the Plan to be filed prior to the date the Debtors commence solicitation for votes for this Plan; *provided, however*, that Pending Litigation Claims shall not include (i) any Claims settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtors for damages or other obligations in a fixed dollar amount payable in a lump sum by a series of payments (which Claims are classified as General Unsecured Claims), (ii) Environmental Claims, (iii) Securities Litigation Claims, or (iv) Tort Claims.

*Person* has the meaning set forth in section 101(41) of the Bankruptcy Code.

*Petition Date* means May 14, 2003, the date on which the order for relief is entered with respect to the Debtors' Chapter 11 Case.

*Plan* means this Plan of Reorganization under chapter 11 of the Bankruptcy Code for the Debtors, dated as of May 14, 2003, including all exhibits, supplements, appendices and schedules hereto filed with the Bankruptcy Court, either in their present form or as the same may be altered, amended or modified from time to time.

*Plan Documents* means the documents and the attachments, exhibits and schedules thereto, which aid in effectuating the Plan.

*Plan Schedules* means the schedules to the Plan in the form filed as a Plan Document.

*Plan Supplement* means the compilation of documents and form of documents specified in the Plan to be filed as set forth in Section 15.15 hereof.

*Plan Support Agreement* means that certain Plan Support Agreement, dated as of May 13, 2003, entered into by and among the Debtors, the Noteholder Group, certain members of the Bank Group and Xcel, as may be amended from time to time, and attached hereto as <u>Exhibit B</u>.

*PMI Unsecured Claims* means any General Unsecured Claim against PMI.

*Post-Petition Interest* shall have the meaning ascribed in Section 4.2 hereof.

*Priority Claim* means either a Priority Non-Tax Claim or a Priority Tax Claim.

*Priority Non-Tax Claim* means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to a priority in right of payment under section 507(a) of the Bankruptcy Code, whether or not such Claim is listed on the Plan Schedules or evidenced by a filed Proof of Claim.

*Priority Tax Claims* means all Claims against the Debtors for taxes entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

*Pro Rata* or *Pro Rata Share* means (a) with respect to any Claim, a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the consideration distributed on account of all Allowed Claims in such Class is the same as the ratio such Claim bears to the total amount of all Allowed Claims (plus Disputed Claims until disallowed) in such Class, and (b) with respect to any Interest, a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Interest in a Class of Interests to the consideration distributed on account of all Allowed Interests in such Class is the same as the ratio such Interest bears to the total amount of all Allowed Interests (plus Disputed Interests until disallowed) in such Class.

*Professional Compensation* and *Reimbursement Claims* means all Administrative Expense Claims for the compensation of Professional Persons and reimbursement of expenses incurred by such Professional Persons (to the extent allowed under sections 330 or 503 of the Bankruptcy Code) through the Confirmation Date.

*Professional Person* means a Person retained or to be compensated pursuant to sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code.

*Punitive Damages* means punitive, exemplary or similar damages, or fines, penalties or similar charges that arise in connection with Environmental Claims, Pending Litigation Claims, Securities Litigation Claims, or Tort Claims.

*Reallocation Liquidity Pool* means the pool comprised of the New NRG Common Stock, Cash and *New NRG Senior Notes* contributed by Electing Cash and Debt Recipients and Electing Equity Recipients.

*Reallocation Transaction* means a transaction pursuant to Article V herein.

*Release Election* means the election right of each creditor of NRG to expressly elect to release, in such creditor's capacity both as a creditor of NRG and (if applicable) as a creditor of any NRG Subsidiary, the Released Parties from all NRG Released Causes of Action by checking an appropriate box on the relevant Ballot, subject to such creditor's receipt of its Pro Rata Share of the Release-Based Amount.

*Reorganized Debtors* means the Debtors, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date, other than the Noncontinuing Debtor Subsidiaries or their respective subsidiaries or affiliates.

*Reorganized NRG* means NRG, or any successor thereto by merger, consolidation, or otherwise, on or after the Effective Date.

*Reserved Cash* means the Cash to be placed in the applicable Disputed Claims Reserve for distribution to holders of Disputed Claims in Class 6 or Class 7 that become Allowed Claims in the amount that shall be subject to approval of the Bankruptcy Court.

*Reserved Notes* means the New NRG Senior Notes to be placed in the applicable Disputed Claims Reserve for distribution to holders of Disputed Claims in Class 6 or Class 7 that become Allowed Claims in the amount that shall be subject to approval of the Bankruptcy Court.

*Reserved Shares* means the shares of New NRG Common Stock to be placed in the applicable Disputed Claims Reserve for distribution to holders of Disputed Claims in Class 6 Claims or Class 7 that become Allowed Claims in the amount that shall be subject to the approval by the Bankruptcy Court.

*Secured Claim* means all Claims against the Debtors, to the extent reflected in the Debtors' Bankruptcy Schedules or a proof of claim as a Secured Claim, which are secured by a Lien on Collateral but only to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, and, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

*Securities Act* means the Securities Act of 1933, as amended.

*Securities Litigation Claims* means all Claims against the Debtors that are asserted in litigation pending against the Debtors under the Securities Act or other applicable federal and state securities laws and listed in an amendment to the Plan to be filed prior to the date the Debtors commence solicitation for votes for this Plan; *provided, however,* that Securities Litigation Claims shall not include (i) any Claims settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtors for damages or other obligations in a fixed dollar amount payable in a lump sum by a series of payments (which Claims

are classified as General Unsecured Claims), (ii) Environmental Claims, (iii) Pending Litigation Claims, or (iv) Tort Claims.

*Standard Rate* means, with respect to Elected Equity Amounts, an amount payable in Cash or New NRG Senior Notes, as specified in Section ___ of the Disclosure Statement.

*Statutory Liens* means liens of landlords, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other liens imposed by law, arising solely by force of a statute on specified circumstances or conditions, or liens of distress for rent, whether or not statutory, but does not include security interests or judicial liens, whether or not such interests or liens are provided by or are dependent on a statute and whether or not such interests or liens are made fully effective by statute.

*Support Agreement* means the Support and Capital Subscription Agreement between Xcel and NRG, dated as of May 29, 2002.

*Tax Rate* means simple interest accruing from the Effective Date at [6%] per annum or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate.

*Term Sheet* means NRG Energy, Inc.'s Term Sheet Concerning NRG Plan and Relationship with Xcel Energy Inc., dated as of May 13, 2003 and attached hereto as Exhibit A.

*Tort Claims* means (i) all other Claims against the Debtors arising from any accusation, allegation, notice, action, claim, demand or otherwise for personal injury, tangible or intangible property damage, products liability or discrimination, or based on employment, including Punitive Damages; and (ii) any Claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtors by any third party, where such indemnification or contribution Claim of such third party is based on a Claim against such third party that if asserted directly against the Debtors would be a Claim included within the immediately preceding clause (i); *provided, however,* that Tort Claims shall not include (a) any Claims settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtors for damages or other obligations in a fixed dollar amount payable in a lump sum by a series of payments (which Claims are classified as General Unsecured Claims); (b) Environmental Claims; (c) Securities Litigation Claims; or (d) Pending Litigation Claims.

*Transferee* means any party who obtains, at any time, a Claim or Cause of Action against NRG or any of the NRG Subsidiaries from any creditor of NRG or any of the NRG Subsidiaries by way of sale, assignment, trade or other transfer.

*Unimpaired* means any Class of Claims or Equity Interests that is not Impaired.

*Voting Record Date* means the date which occurs five (5) Business Days following the approval of the Disclosure Statement by the Bankruptcy Court.

*Workers' Compensation Claims* means all Claims against the Debtors by employees of the Debtors for the payment of workers' compensation benefits under applicable law.

*Worthless Stock Deduction* means the worthless stock deduction pursuant to the Internal Revenue Code of 1986, as amended, which Xcel (or one of its non-NRG subsidiaries) will receive as a result of the cancellation of the NRG Old Common Stock as part of this Plan.

*Xcel* means Xcel Energy Inc., a Minnesota corporation.

*Xcel Note* means the note described in Section 2.3 of this Plan.

*Xcel Settlement* means the settlement between the Debtors, Xcel, the Bank Group and the Noteholder Group as set forth in the Xcel Settlement Agreement.

*Xcel Settlement Agreement* means the agreement governing the Xcel Settlement dated as of _____ __, 2003 by and among the Debtors, Xcel, the Global Steering Committee and the Noteholder Group, and all subsequent amendments and modifications thereto.

*Xcel Settlement Approval Order* means the order entered by the Bankruptcy Court approving the Xcel Settlement Agreement, which is in form and substance satisfactory to Xcel.

*Xcel Settlement Motion* means the motion filed by the Debtors seeking approval of the Xcel Settlement Agreement, which is in form and substance satisfactory to Xcel.

*Xcel Shares Liquidation Proceeds* means, in the event Xcel exercises the Xcel Shares Option, the Cash received by the Disbursing Agent in exchange for any XEL Stock that may be paid in satisfaction of the Second Installment and, if applicable, the XEL Stock distributed as part of the Initial Contribution.

     1.2    *Interpretation; Application of Definitions and Rules of Construction.* Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified herein, all section, article, schedule or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

     1.3    *Defined Terms from Term Sheet or Plan Support Agreement.* Any capitalized terms used in this Plan which are not specifically defined in Section 1.1, but which are defined in the Term Sheet or the Plan Support Agreement shall have the meaning ascribed to such term in the Term Sheet or Plan Support Agreement, as the case may be.

## ARTICLE II.
## DESCRIPTION OF SECURITIES TO BE ISSUED UNDER THE PLAN

The following securities will be distributed to the holders of Allowed Claims (as set forth herein):

     2.1    *New NRG Senior Notes.* The New NRG Senior Notes shall (i) be in an initial principal amount of $500,000,000.00; (ii) at the option of Reorganized NRG either (a) accrue interest commencing on the Effective Date payable semiannually in Cash at a rate of 10% per annum, or (b) accrue interest at a rate of 12% per annum payable in kind; *provided, however,* that any interest paid in kind shall be paid in Cash upon the earlier of the fifth anniversary of the Effective Date or the maturity date of the New NRG Senior Notes; and (iii) mature on the seventh anniversary of the Effective Date. The New NRG Senior Notes will be issued under the New NRG Senior Note Indenture. A form of the New NRG Senior Note Indenture shall be contained in the Plan Supplement.

     2.2    *New NRG Common Stock.* The New NRG Common Stock shall consist of 100,000,000 shares of new common stock of Reorganized NRG with par value of $0.01 per share. The bylaws of Reorganized NRG authorizing the issuance of New NRG Common Stock shall be contained in the Plan Supplement.

     2.3    *Xcel Note.* The Xcel Note shall (a) be a non-amortizing promissory note issued by NRG to Xcel in an initial principal amount of $10 million, (b) accrue interest at a rate of 3% per annum, and (c) mature two and one-half (2.5) years after the Effective Date. A form of Xcel Note shall be contained in the Plan Supplement.

     2.4    *Exit Facility.* NRG will seek an exit facility on commercially reasonable terms of up to $500 million to be used primarily as a letter of credit facility to replace the Cash that NRG is currently reserving to fund working capital and meet trading collateral needs.

## ARTICLE III.
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS, PRIORITY TAX CLAIMS AND CONVENIENCE CLAIMS

3.1     *Administrative Expense Claims.*  Except as otherwise provided herein, or to the extent that any Entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon as practicable thereafter, or on such other date as may be ordered by the Bankruptcy Court; *provided, however,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (including real and personal property taxes and franchise fees) or liabilities arising under loans or advances to or other obligations incurred by the Debtors shall be paid in full and performed by the Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.  Except as provided under applicable non-bankruptcy law, Post-Petition Interest will not be paid on Allowed Administrative Claims.

3.2     *Professional Compensation and Reimbursement Claims; Fee Applications.*  The holders of Professional Compensation and Reimbursement Claims shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is ninety (90) days after the Confirmation Date, or such other date as may be fixed by the Bankruptcy Court.  If granted by the Bankruptcy Court, such award shall be paid in full in such amounts as are Allowed by the Bankruptcy Court either (a) on the date such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtors.  The failure to timely file a Fee Application shall result in the Professional Compensation and Reimbursement Claim being forever barred and discharged.

3.3     *Priority Tax Claims.*  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, including Post-Petition Interest (if applicable), Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter.

3.4     *Convenience Claims.*  Holders of Unsecured Claims against any Debtor that otherwise would be included in Class 6 or Class 7, but with respect to each such Claim, the applicable Claim either (a) is equal to or less than $50,000.00 or (b) is reduced to $50,000.00, in full settlement of such claim, pursuant to an election by such holder made on the Ballot (which election shall include granting the applicable releases described in Section III.A of the Term Sheet) provided for voting on the Plan by the applicable voting deadline as specified in the Disclosure Statement, shall be treated in accordance with Section 4.6 herein.  For purposes of treatment under Class 2, multiple Claims of a holder against a particular Debtor arising in a series of similar or related transactions between such Debtor and the original holder of such Claims will be treated as a single Claim and no splitting of Claims will be recognized for purposes of distribution.

## ARTICLE IV.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND
## EQUITY INTERESTS AND VOTING RIGHTS

4.1     *Summary.*  Except to the extent that an Eligible Reallocation Creditor completes a Reallocation Transaction pursuant to Article V hereof, the categories of Claims and Interests listed below classify Allowed Claims and Allowed Interests as applicable for each Debtor for all purposes, including voting, confirmation, and distribution pursuant to the Plan.  Except as otherwise provided in the Plan or the Confirmation Order or required by subsection 506(b) or section 1124 of the Bankruptcy Code, (a) Allowed Claims do not include interest or similar finance charges on such claims that accrue after the Petition Date, and (b) any Post-Petition Interest that is payable in respect of a Priority Tax Claim shall be calculated at the applicable Tax Rate.  The charts set forth below are only

intended as a summary description of the treatment of the described Claims and Interests and the terms of the debt and securities to be issued under the Plan.  Sections 4.5 through 4.18 of this Article IV of the Plan control to the extent of any inconsistency between the provisions thereof and the following summary.  In addition, Xcel shall be excluded from all Classes of Claims and Interests listed below.

| CLASS | TYPE OF CLAIM/INTEREST | TREATMENT | VOTING RIGHTS |
|---|---|---|---|
| Class 1 | Unsecured Priority Claims | *Unimpaired*.  Each holder of a Class 1 Claim will receive Cash in an amount equal to the Allowed Amount of their Claim. | Not entitled to vote.  Deemed to accept. |
| Class 2 | Convenience Claims | *Unimpaired*.  Each holder of an Allowed Claim in Class 2 will receive Cash equal to the amount of such Claim against such Debtor (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section 3.4 of the Plan). | Not entitled to vote.  Deemed to accept. |
| Class 3 | Secured Claims against Noncontinuing Debtor Subsidiaries | *Impaired*. [At the Debtors' option,] the Debtors shall distribute to each holder of a Secured Claim classified in Class 3 (a) the Collateral securing such Allowed Secured Claim, (b) Cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any Collateral securing such Allowed Secured Claim, less the actual costs and expenses of disposing of such Collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of such Allowed Secured Claim, on the later of (i) the Effective Date and (ii) the fifteenth Business Day of the first month following the month in which such Claim becomes an Allowed Secured Claim, or as soon after such dates as is practicable.  Each holder of an Allowed Claim in Class 3 shall retain the Liens securing such Claim as of the Confirmation Date until the Debtors shall have made the distribution to such holder provided for in Article IV of the Plan. | Entitled to vote |
| Class 4 | *Intentionally Omitted* | | |
| Class 5 | Miscellaneous Secured Claims | *Impaired*. [At the Debtors' option,] the Debtors shall distribute to each holder of an Allowed Miscellaneous Secured Claim (a) the Collateral securing such Allowed Secured Claim, (b) Cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any Collateral securing such Allowed Secured Claim, less the actual costs and expenses of disposing of such Collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of an Allowed Miscellaneous Secured Claim, on the later of (i) the Effective Date and (ii) the fifteenth Business Day of the first month following the month in which such Claim becomes an Allowed Secured Claim, or as soon after such dates as is practicable.  Each holder of an Allowed Claim in Class 5 shall retain the Liens securing such Claim as of the Confirmation Date until the Debtors shall have made the distribution to such holder provided for in Article IV of the Plan. | Entitled to vote |

| Class | Type of Claim/Interest | Treatment | Voting Rights |
|---|---|---|---|
| Class 6 | NRG Unsecured Claims, including NRG Rejected Guaranty Claims | *Impaired.* Subject to Section 10.2 of the Plan with respect to the NRG Letter of Credit Claims, each holder of an Allowed Claim in Class 6 will receive its Pro Rata Share of (a) on the Effective Date, the New NRG Senior Notes, (b) on the Effective Date, 100,000,000 shares of New NRG Common Stock, subject to dilution by the Management Incentive Plan as set forth in Section IX.J of the Term Sheet, and (c) on the date of the Third Installment (or as soon thereafter as practical), Cash in an amount not less than the Release-Based Amount; and *provided further that* the Cash distributable to holders of Allowed Claims in Class 6 represents a Pro Rata Share of the Released-Based Amount, as set forth and described in Section III.A of the Term Sheet and each holder of an Allowed Claim classified in Class 6 shall receive its Pro Rata Share of such Cash only if such holder elects (by checking the appropriate box on its Ballot) to grant the releases described in Section III.A of the Term Sheet. | Entitled to vote |
| Class 7 | PMI Unsecured Claims | *Impaired.* On the Effective Date, each holder of an Allowed Class 7 Claim will receive its Pro Rata Share of New NRG Senior Notes and shares of New NRG Common Stock allocated to Class 7 from Class 6. | Entitled to vote |
| Class 8 | Unsecured Noncontinuing Debtor Subsidiary Claims | *Impaired.* Each holder of an Allowed Class 8 Claim shall receive no distribution under the Plan on account of such Class 8 Claims. | Not entitled to vote. Deemed to reject. |
| Class 9 | NRG Intercompany Claims | To be determined. | To be determined. |
| Class 10 | *Intentionally Omitted* | | |
| Class 11 | NRG Old Common Stock | *Impaired.* No property will be distributed to or retained by the holders of Allowed Equity Interests in Class 11. On the Effective Date, each and every Equity Interest in Class 11 shall be cancelled and discharged and the holders of Class 11 Equity Interests shall receive no distribution under the Plan on account of such Equity Interests. | Not entitled to vote. Deemed to reject. |
| Class 12 | PMI Common Stock | *Unimpaired.* NRG shall retain its 100% ownership interest in PMI. | Not entitled to vote. Deemed to accept. |
| Class 13 | Securities Litigation Claims | *Impaired.* Each and every Claim in Class 13 shall be cancelled and discharged and the holders of Class 13 Claims shall receive no distribution under the Plan on account of such Claims. | Not entitled to vote. Deemed to reject. |
| Class 14 | Noncontinuing Debtor Subsidiary Common Stock | *Impaired.* Each and every Equity Interest in Class 14 shall be cancelled and discharged and the holders of Class 14 Equity Interests shall receive no distribution under the Plan on account of such Equity Interests. | Not entitled to vote. Deemed to reject. |

4.2     *Payment of Interest.* Allowed Claims shall include amounts owed with respect to the period prior to the Petition Date and applicable interest, fees and other charges accrued and unpaid during such period. Unless otherwise provided herein, there shall not be any distributions on account of interest accrued from and after the Petition Date through the Effective Date ("Post-Petition Interest").

4.3     *Allowance of Bank Group and Note Claims.*  All Note Claims, all NRG Letter of Credit Claims, all NRG FinCo Secured Revolver Claims, all NRG Unsecured Revolver Claims, and all recourse claims of any project lender against NRG, excluding in each case Post-Petition Interest, letter of credit fees and other similar post-petition charges not generally allowable under the Bankruptcy Code, shall in full constitute Allowed Claims, in accordance with the terms of the applicable documents that give rise to such Claims, without defense, offset, counterclaim, reduction, subordination or recharacterization.  Notwithstanding the foregoing, such Claims can be objected to solely with regard to (i) the proper calculation of the amount of any such Claims in accordance with the relevant documentation for such Claims and (ii) solely in connection therewith, the proper interpretation of all such documents.

4.4     *Timing of Payments and Distributions.*  Except as otherwise provided in the Plan and to the extent a holder of an Allowed Claim or Equity Interest has otherwise been paid all or a portion of such holder's Allowed Claim or Equity Interest prior to the Effective Date, each of the distributions specified in this Article IV with respect to each Allowed Claim or Equity Interest shall (i) occur on the later of the Effective Date and the date such Allowed Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as practicable thereafter, and (ii) be in full and complete settlement, satisfaction and discharge of such Allowed Claim or Equity Interest.

4.5     *Class 1 - Unsecured Priority Claims*

(a)     *Distributions.*  On the Effective Date, each holder of an Allowed Class 1 Claim will receive Cash in an amount equal to the Allowed Amount of its Claim.

(b)     *Impairment and Voting.  Class 1 is unimpaired under the Plan.  Each holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.*

4.6     *Class 2 - Convenience Claims.*

(a)     *Distributions.*  Each holder of an Allowed Class 2 Claim will receive Cash equal to the amount of such Claim against such Debtor (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section 3.4).

(b)     *Impairment and Voting.*  Class 2 is unimpaired under the Plan.  Each holder of an Allowed Class 2 Claim against a Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.7     *Class 3 - Secured Claims against Noncontinuing Debtor Subsidiaries.*

(a)     *Distributions.*  [At the Debtors' option,] the Debtors shall distribute to each holder of a Secured Claim classified in Class 3 (a) the Collateral securing such Allowed Secured Claim, (b) Cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any collateral securing such Allowed Secured Claim, less the actual costs and expenses of disposing of such Collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of such Allowed Secured Claim, on the later of (i) the Effective Date and (ii) the fifteenth Business Day of the first month following the month in which such Claim becomes an Allowed Secured Claim, or as soon after such dates as is practicable.  Each holder of an Allowed Claim in Class 3 shall retain the Liens securing such Claim as of the Confirmation Date until the Debtors shall have made the distribution to such holder provided for in Article IV of the Plan.

(b)     *Impairment and Voting.*  Class 3 is impaired under the Plan.  Each holder of an Allowed Class 3 Claim against a Debtor is entitled to vote to accept or reject the Plan.

4.8     *Class 4 - Intentionally Omitted.*

4.9     *Class 5 - Miscellaneous Secured Claims.*

(a)     *Distributions.* [At the Debtors' option,] the Debtors shall distribute to each holder of an Allowed Miscellaneous Secured Claim (a) the Collateral securing such Allowed Secured Claim, (b) Cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any Collateral securing such Allowed Secured Claim, less the actual costs and expenses of disposing of such Collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of an Allowed Miscellaneous Secured Claim, on the later of (i) the Effective Date and (ii) the fifteenth Business Day of the first month following the month in which such Claim becomes an Allowed Secured Claim, or as soon after such dates as is practicable. Each holder of an Allowed Claim in Class 5 shall retain the Liens securing such Claim as of the Confirmation Date until the Debtors shall have made the distribution to such holder provided for in Section 4.9 of the Plan.

(b)     *Impairment and Voting.* Class 5 is impaired under the Plan. Each holder of an Allowed Class 5 Claim against a Debtor is entitled to vote to accept or reject the Plan.

4.10    *Class 6 - NRG Unsecured Claims, Including NRG Rejected Guaranty Claims*

(a)     *Distributions.* Subject to Section 10.2 of the Plan with respect to the NRG Letter of Credit Claims, each holder of an Allowed Claim in Class 6 will receive its Pro Rata Share of (a) on the Effective Date, the New NRG Senior Notes, (b) on the Effective Date, 100,000,000 shares of New NRG Common Stock, subject to dilution by the Management Incentive Plan as set forth in Section IX.J of the Term Sheet, and (c) on the date of the Third Installment (or as soon thereafter as practical), Cash in an amount not less than the Release-Based Amount; and provided further that the Cash distributable to holders of Allowed Claims in Class 6 represents a Pro Rata Share of the Released-Based Amount, as set forth and described in Section III.A of the Term Sheet and each holder of an Allowed Claim classified in Class 6 shall receive its Pro Rata Share of such Cash only if such holder elects (by checking the appropriate box on its Ballot) to grant the releases described in Section III.A of the Term Sheet.

(b)     *Impairment and Voting.* Class 6 is impaired under the Plan. Each holder of an Allowed Class 6A Claim is entitled to vote to accept or reject the Plan.

4.11    *Class 7 - PMI Unsecured Claims.*

(a)     *Distributions.* On the Effective Date, each holder of an Allowed Class 7 Claim will receive its Pro Rata Share of New NRG Senior Notes and shares of New NRG Common Stock allocated to Class 7 from Class 6.

(b)     *Impairment and Voting.* Class 7 is impaired under the Plan. Each holder of an Allowed Class 7 Claim is entitled to vote to accept or reject the Plan.

4.12    *Class 8 - Unsecured Noncontinuing Debtor Subsidiary Claims.*

(a)     *Distributions.* Each holder of an Allowed Class 8 Claim shall receive no distribution under the Plan on account of such Class 8 Claims.

(b)     *Impairment and Voting.* Class 8 is impaired under the Plan. Each holder of an Allowed Class 8 Claim is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

4.13    *Class 9 - NRG Intercompany Claims.*

(a)     *Distributions.* To be determined.

(b)     *Impairment and Voting.* To be determined.

4.14     *Intentionally Omitted.*

4.15     *Class 11 - NRG Old Common Stock.*

(a)     *Distributions.* No property will be distributed to or retained by the holders of Allowed Claims in Class 11. On the Effective Date, each and every Interest in Class 11 shall be cancelled and discharged and the holders of such Interests in Class 11 shall receive no distribution under the Plan.

(b)     *Impairment and Voting.* Class 11 is impaired by the Plan and holders of Class 11 Interests shall not be entitled to vote on the Plan and, instead, shall be deemed to have rejected the Plan.

4.16     *Class 12 - PMI Old Common Stock.*

(a)     *Distributions.* NRG shall retain its 100% ownership interest in the Old Common Stock of PMI

(b)     *Impairment and Voting.* Class 12 is unimpaired under the Plan. Each holder of a Class 12 Equity Interest shall not be entitled to vote on the Plan, and instead, shall be deemed to have accepted the Plan.

4.17     *Class 13 - Securities Litigation Claims.*

(a)     *Distributions.* Each and every Claim in Class 13 shall be cancelled and discharged and the holders of Class 13 Claims shall receive no distribution under the Plan on account of such Claims.

(b)     *Impairment and Voting.* Class 13 is impaired by the Plan and holders of Class 13 Claims shall not be entitled to vote on the Plan and, instead, shall be deemed to have rejected the Plan.

4.18     *Class 14 - Noncontinuing Debtor Subsidiary Common Stock.*

(a)     *Distributions.* Each and every Equity Interest in Class 14 shall be cancelled and discharged and the holders of Class 14 Equity Interests shall receive no distribution under the Plan on account of such Equity Interests.

(b)     *Impairment and Voting.* Class 14 is impaired by the Plan and holders of Class 14 Equity Interests shall not be entitled to vote on the Plan and, instead, shall be deemed to have rejected the Plan.

### ARTICLE V.
### NRG REALLOCATION PROCEDURES

5.1     *Reallocation Procedures.* Each Eligible Reallocation Creditor will have the option of electing on its Ballot to be either an Electing Equity Recipient or an Electing Cash and Debt Recipient. Such election may be made irrespective of whether such creditor has voted in favor of the Plan. If a creditor makes neither election, then the reallocation procedures in this Article V will not apply, *and* such creditor shall be entitled to receive the distributions it is entitled to receive in respect of its Allowed Claims in Class 6 or Class 7 under Article IV hereof. Any creditor holding a Disputed Claim in Class 6 or Class 7 as of the Voting Record Date shall be entitled, but not required, to make an election pursuant to Section V hereof; *provided that* any such creditor who makes an election on its Ballot must have an Allowed Claim on or before the Effective Date to take part in any reallocation pursuant to Section V hereof.

(a)     *Electing Equity Recipient Election.* By making an election to be an Electing Equity Recipient, an Eligible Reallocation Creditor agrees to contribute to the Reallocation Liquidity Pool some or all of the Cash (other than Cash representing the Separate Bank Settlement Payment) and New NRG Senior Notes comprising the respective Elected Cash Amount and Elected Debt Amount it would otherwise receive in respect of its Allowed Claims in Class 6 or Class 7 under Article IV hereof.

(b)     *Electing Cash and Debt Recipient Election.* By making the opposite election, to be an Electing Cash and Debt Recipient, a Creditor agrees to offer for reallocation some or all of the New NRG Common Stock comprising the Elected Equity Amount it would otherwise receive in respect of its Allowed Claims in Class 6 or Class 7 under Article IV hereof, at the Standard Rate or at such lower Cash or debt price [rounded up to the nearest $___/___%] as may be respectively specified by the Electing Cash and Debt Recipient on its Ballot at its sole discretion.

(c)     *Reallocation Administration.* The Debtors will administer the reallocation as follows:

(i)     First, all New NRG Common Stock that would otherwise have been distributed to Electing Cash and Debt Recipients pursuant to the terms of the Plan will first be reallocated so that such Electing Cash and Debt Recipients shall instead receive Cash from the Reallocation Liquidity Pool to the extent such Cash is available, starting with the lowest specified Cash price per share for New NRG Common Stock and moving upward until either all available Cash or all available New NRG Common Stock has been reallocated pursuant to the provisions of this Article V.

(ii)     Second, all New NRG Senior Notes in the Reallocation Liquidity Pool will be reallocated to Electing Cash and Debt Recipients in exchange for any available New NRG Common Stock offered for reallocation pursuant to the provisions of this Article V, starting with the lowest specified price (for consideration in the form of New NRG Senior Notes) until either all remaining New NRG Senior Notes in the Reallocation Liquidity Pool or New NRG Common Stock made available by Electing Cash and Debt Recipients in return for New NRG Senior Notes are exhausted.

(iii)     Once the foregoing reallocations are completed, each Electing Cash and Debt Recipient will be entitled to receive under this Plan (A) Cash for its New NRG Common Shares, at the Cash price it has specified (or at the Standard Rate, if it has not been specified), to the extent taken up in the reallocation in Section 5.1(c)(i) hereof, (B) New NRG Senior Notes at the debt price it has specified (or at the Standard Rate, if it has not been specified), to the extent allocated in Section 5.1(c)(ii) hereof, and (C) its initially allocated New NRG Common Stock, to the extent not so allocated in any reallocation, in addition to the Cash and New NRG Senior Notes it was otherwise entitled to receive under this Plan.

(iv)     The Debtors shall calculate the Pro Rata Share of each Electing Equity Recipient based upon its initial contribution of Cash and New NRG Senior Notes to the Reallocation Liquidity Pool and such Electing Equity Recipient will receive a distribution of such Pro Rata Share of the New NRG Common Stock, and, if applicable, New NRG Senior Notes or Cash remaining in the Reallocation Liquidity Pool following the reallocation and distribution under Section 5.3(c)(iii), in addition to the New NRG Common Stock it was otherwise entitled to receive under this Plan.

(v)     The Debtors shall be authorized to adopt such additional detailed procedures, not inconsistent with the foregoing, to efficiently administer the reallocation, including procedures for avoiding issuance of fractional shares of New NRG Common Stock or New NRG Senior Notes having denominations other than multiples of $1,000.00. If two or more Electing Cash and Debt Recipients shall each have made New NRG Common Stock available at the same price but there is an insufficient amount of Cash or New NRG Senior Notes available in the Reallocation Liquidity Pool to effect a reallocation for all such equity, the Claims Agent shall endeavor to reallocate any available Cash or New NRG Senior Notes on a Pro Rata basis among such Electing Cash and Debt Recipients.

## ARTICLE VI.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND EQUITY INTERESTS

6.1     *Voting of Claims and Equity Interests.* Each holder of record as of the Voting Record Date of an Allowed Claim or Equity Interest in an Impaired Class of Claims or Equity Interests entitled to vote as set forth in Article IV hereof shall be entitled to vote separately to accept or reject the Plan with regard to each Impaired Class of Claims or Equity Interests. If the Debtors object to a Claim, the Claim becomes a Disputed Claim. A Disputed

Claim is not entitled to vote on the Plan unless the Debtors obtain or the holder of the Disputed Claim obtains an order of the Bankruptcy Court estimating the amount of the Disputed Claim for voting purposes. If the Debtors do not object to a Claim prior to the date on which the Disclosure Statement and the Ballot are transmitted to creditors for voting, the holder of such Claim will be permitted to vote on the Plan in the full amount of the Claim as filed.

6.2 *Procedural Consolidation*. The Plan is premised upon the procedural consolidation of the Debtors solely for purposes of actions associated with the confirmation and consummation of the Plan, including for purposes of voting, confirmation and distribution, including for purposes of determining whether the requirements of 1129(a)(8) have been satisfied. As contrasted with procedural consolidation, substantive consolidation may affect the substantive rights and obligations of creditors and debtors, depending upon the nature of the requested consolidation.

The procedural consolidation contemplated by the Plan shall not affect any substantive rights or obligations of any of the creditors. Procedural consolidation shall save the Debtors certain administrative costs by permitting them to solicit votes on a single Plan instead of separately soliciting votes on Plan acceptance for each of the Debtors. The Debtors believe that an alternative result would confuse creditors and stockholders without adding to their ability to decide whether to accept or reject the Plan. Except as otherwise set forth herein, the Plan does not contemplate the merger or dissolution of any Debtor or the transfer or commingling of any asset of any Debtor.

6.3 *Elimination of Vacant Classes*. Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 or as to which no vote is cast shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.4 *Nonconsensual Confirmation*. If any Impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.8 hereof or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

6.5 *Method of Distributions Under the Plan.*

(a) *Disbursing Agent.* All distributions under the Plan shall be made by the Debtors as Disbursing Agents or such other Entity designated by the Debtors as Disbursing Agent. A Disbursing Agent shall not be required to provide any bond, surety or other security for the performance of its duties, unless otherwise ordered by the Bankruptcy Court; and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond, surety or other security shall be borne by the Debtors.

(b) *Distributions to Holders as of the Distribution Record Date.*

(i) Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made (A) to the holder of each Allowed Claim or Equity Interest at the address of such holder as listed on the Debtors' Bankruptcy Schedules as of the Distribution Record Date, unless the Debtors have been notified in writing of a change of address, including by the filing of a timely proof of Claim or Equity Interest by such holder that provides an address for such holder different from the address reflected on the Debtors' Bankruptcy Schedules, or (B) pursuant to the terms of a particular indenture of the Debtors or in accordance with other written instructions of a trustee under such indenture.

(ii) As of the close of business on the Distribution Record Date, the claims register and records of the stock transfer agent shall be closed, and there shall be no further changes in the record holder of any Claim or Equity Interest. The Debtors shall have no obligation to recognize any transfer of any Claim or Equity Interest occurring after the Distribution Record Date. The Debtors shall instead be authorized and entitled to recognize and deal for all purposes of the Plan with only those record holders stated on the claims register or the records of the stock transfer agent as of the close of business on the Distribution Record Date.

(c)     *Distributions of Cash.*  Any payment of Cash made by the Debtors pursuant to the Plan shall, at the Debtors' option, be made to the appropriate bank administrative agents, trustees for the Notes or other creditors for distribution by check drawn on a domestic bank or wire transfer, and shall first be drawn proportionately from the segregated Cash accounts established pursuant to the terms of this Plan before any other Cash sources are used.

(d)     *Timing of Distributions.*  Except as otherwise set forth in the Plan, payments and distributions to holders of Allowed Claims or Equity Interests on the Effective Date shall be made on the Effective Date, or as soon as practicable thereafter.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(e)     *Allocation of Plan Distributions.*  All distributions in respect of Allowed Claims shall be allocated first to the portion of such Claims representing interest (as determined for federal income tax purposes), second to the original principal amount of such Claims (as determined for federal income tax purposes), and any excess to the remaining portion of such Claims.

(f)     *Minimum Distributions.*  No payment of Cash less than one hundred U.S. dollars ($100.00) shall be made by the Debtors to any holder of a Claim or Equity Interest unless a request therefor is made in writing to the Debtors.

(g)     *Unclaimed Distributions.*  All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and vested in the Reorganized Debtors and any entitlement of any holder of any Claim or Equity Interest to such distributions shall be extinguished and forever barred.

6.6     *Objections to and Resolution of Administrative Expense Claims and Claims.*  Except as to applications for allowance of compensation and reimbursement of Professional Compensation and Reimbursement Claims under sections 330 and 503 of the Bankruptcy Code, the Reorganized Debtors shall, on and after the Effective Date, have the exclusive right to make and file objections to Administrative Expense Claims.  Except as to applications for allowance of compensation and reimbursement of Professional Compensation and Reimbursement Claims under sections 330 and 503 of the Bankruptcy Code, on and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims and compromise, settle or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without the approval of the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court, (a) all objections to Claims (except for Administrative Expense Claims) shall be served and filed upon the holder of the Claim as to which the objection is made (and, as applicable, upon the Debtors, the Noteholder Group, the Global Steering Committee, and the Committee) as soon as is practicable, but in no event later than the Effective Date, and (b) all objections to Administrative Expense Claims shall be served and filed upon the holder of the Administrative Expense Claim as to which the objection is made (and, as applicable, upon the Debtors or the Reorganized Debtors, as the case may be, the Noteholder Group, the Global Steering Committee, the Committee) as soon as is practicable, but in no event later than ninety (90) days after the Effective Date.

6.7     *Payment of Other Fees.*  Any reasonable unpaid fees and expenses accrued through the Confirmation Date (except for any unpaid fees and expenses previously disallowed by the Bankruptcy Court) of: (i) **[INSERT THE NAMES OF THE TRUSTEES, IF ANY]** (acting in their capacities as trustees and, if applicable, acting in their capacities as Disbursing Agents), **[INSERT THE NAME OF ISSUERS, IF ANY]** (ii) the Global Steering Committee and their respective professionals; provided that the Global Steering Committee shall not have more than one set of advisors; (iii) the Noteholders and their respective professionals for the period from the Petition Date until the appointment of counsel to the Committee; (iv) **[INSERT THE NAME OF THE EXIT FACILITY BANK, IF ANY]**, attorneys' fees), shall be paid by the Debtors within ten (10) days after the Effective Date.  Any such fees and expenses accruing after the Effective Date shall be payable as provided in the applicable agreement providing for such payment, or, without the need for any additional court order, in the case of **[INSERT THE NAME OF THE BANK, IF ANY]**, in its capacity as administrative agent under the **[EXIT FACILITY]**, at least quarterly.  Upon payment of such fees and expenses, such Persons shall be deemed to have released their Liens securing payment of their fees and expenses for all fees and expenses accrued through the Effective Date.

6.8     *Cancellation of Existing Securities and Agreements.* Except as otherwise provided herein, on the Effective Date, the Debtor's obligations under the promissory notes, bonds, debentures and all other debt instruments evidencing any Claim, including Administrative Expense Claims, other than those that are reinstated and rendered unimpaired or renewed and extended pursuant to Article IV hereof, or renewed and remain outstanding pursuant to Article IV hereof, respectively, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under the agreements and indentures governing such Claims, as the case may be, shall be discharged. Except as otherwise provided herein, the Equity Interests shall be cancelled. Holders of promissory notes, bonds, debentures and any and all other debt instruments evidencing any Claim shall not be required to surrender such instruments; *provided, however,* that certain Notes and the indentures applicable thereto shall continue in effect solely for the purposes of (a) allowing the holders of such Notes to receive their distributions hereunder, (b) allowing the Notes trustee to make the distributions, if any, to be made on account of such Notes, and (c) permitting such trustee, if applicable, to assert a charging Lien against any such distributions for payment of the trustee fee under the relevant Note indentures.

6.9     *Impairment Controversies.* If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

6.10    *Confirmation Without Acceptance by All Impaired Classes.* Classes 8, [9,] 11, 13 and 14 are classes of Claims or Equity Interests that are deemed to have rejected the Plan. Notwithstanding such rejections (or the rejection by one or more other impaired Classes under the Plan), the Debtors intend to seek confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE VII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     *Assumption, Assignment or Rejection of Executory Contracts and Unexpired Leases.*

(a)     *Assumption of Executory Contracts and Unexpired Leases.* Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between or among the Debtors and any Person or Governmental Entity shall be deemed assumed by the Debtors as of the Effective Date, except that any executory contract or unexpired lease shall be deemed rejected by the Debtors as of the Effective Date (i) that has been rejected pursuant to a Final Order entered prior to the Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date that results in a Final Order or (iii) that is set forth in Exhibit A to the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the conclusion of the confirmation hearing, to amend the Plan Supplement so as to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed by the Debtors or rejected, as the case may be, as of the Effective Date. The Debtors will give notice of any such amendment to each counterparty to any executory contract the status of which is changed as a result of the amendment (i.e., any executory contract which is to be assumed, rejected or assumed and assigned as a result of the amendment). In the event that the counterparty opposes such proposed amendment, the Debtors will make all reasonable efforts to provide such counterparty a reasonable opportunity under the circumstances to object prior to the Confirmation Date and, to the extent that such counterparty had the right to vote on the Plan, or became entitled to vote on the Plan as a result of any amendments to the Plan, to provide such counterparty a reasonable time to cast a Ballot to accept or reject the Plan, or to amend its Ballot. The listing of a document in the Plan Supplement shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(b)     *Assumption and Assignment of Executory Contracts and Unexpired Leases.* Pursuant to sections 365(f) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases specified in Exhibit B to the Plan Supplement shall be deemed assumed and assigned by the Debtors on the Effective Date to those entities as set forth in such schedules. The Debtors reserve the right, on or prior to the conclusion of the Confirmation Hearing, to amend the Plan Supplement so as to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory

contract(s) or unexpired lease(s) will be treated as set forth on such schedules as of the Effective Date. Each executory contract and unexpired lease to be assumed or assumed and assigned by the Debtors shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in the Plan Supplement.

7.2    *Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness.* Each executory contract and unexpired lease listed or to be listed in the Plan Supplement shall include (i) modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in the Plan Supplement, and (ii) executory contracts or unexpired leases appurtenant to the premises listed in the Plan Supplement, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements or vault, tunnel or bridge agreements, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements previously have been assumed or assumed and assigned by the Debtors.

7.3    *Approval of Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 7.1(a) of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the unexpired leases of non-residential property specified in Section 7.1(a) hereof through the date of entry of the Confirmation Order, (c) approval, pursuant to sections 365(f) and 1123(b)(2) of the Bankruptcy Code, of the assignment of the executory contracts and unexpired leases assigned pursuant to Section 7.1(b) and Article VII hereof, and (d) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 7.1(a) hereof.

7.4    *Cure of Defaults.* Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed, or assumed and assigned, by the Debtors pursuant to Sections 7.1(a) and (b) hereof, in accordance with section 365(b)(1) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties.

7.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.* Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 7.1 hereof must be properly filed in the Chapter 11 Case and served upon the Debtors no later than the later of the Bar Date or the date specified in the order of the Bankruptcy Court approving such rejection of such executory contract or unexpired lease. All such Claims not filed within such time shall be forever barred from assertion against the Debtors, its Estates and its property.

7.6    *Retiree Benefits.* Payments, if any, due to any Person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical or hospital care benefits, or benefits in the event of sickness, accident, disability or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period the Debtors have obligated themselves to provide such benefits.

## ARTICLE VIII.
## IMPLEMENTATION OF THE PLAN

8.1    *Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.* Except as otherwise provided herein, after the Effective Date, each of the respective Reorganized Debtors shall continue to exist in accordance with the applicable laws in the respective jurisdictions in which they are incorporated and pursuant to their respective certificates of incorporation, articles of formation, or by-laws in effect prior to the

Effective Date, except to the extent that such certificates of incorporation, articles of formation, or by-laws are amended under this Plan. In the event Class 7 rejects the Plan, PMI may be withdrawn from the Plan pursuant to Section 8.10, and may not be reorganized but rather could be liquidated. On and after the Effective Date, each of the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and compromise or settle any claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each of the Reorganized Debtors may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

8.2     *Corporate Governance, Directors, Officers, and Corporate Action.*

(a)     *Certificates of Incorporation and By-Laws.* Effective on the Effective Date, each Reorganized Debtor's certificate of incorporation shall be amended to be an Amended and Restated Certificate of Incorporation, and the existing certificates of incorporation shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The Amended and Restated Certificate of Incorporation shall, among other things, authorize the issuance of the New NRG Common Stock, where applicable, in amounts not less than the amounts necessary to permit the distributions required or contemplated by the Plan. After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates of incorporation and by-laws as permitted by applicable law.

(b)     *Directors and Officers of Reorganized NRG.* Subject to any requirement of the Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the officers of Reorganized NRG shall be [                              ]. On the Effective Date, the operation of the business of the Reorganized Debtors shall become the general responsibility of their respective boards of directors subject to, and in accordance with, their respective certificates of incorporation or other such organizational documents. The board of directors for Reorganized NRG shall consist of the post-reorganization CEO and ten (10) individuals, of which, six (6) directors shall be designated by the members of the Noteholder Group serving on the Committee and four (4) directors shall be designated by the members of the Bank Group. Such directors shall be deemed elected or appointed, as the case may be, pursuant to the Confirmation Order but shall not take office and shall not be deemed to be elected or appointed until the Effective Date. Those directors and officers not continuing in office shall be deemed removed therefrom as of the Effective Date pursuant to the Confirmation Order.

(c)     *Corporate Action.* On the Effective Date, the adoption of the Amended and Restated Certificates of Incorporation, the amended and restated by-laws, and any necessary certificates of designation or similar constituent documents, the selection of members of the board of directors and officers for Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the applicable provisions of the Plan). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect pursuant to applicable state law without any requirement of further action by the holders of the Equity Interests in the Debtors, where applicable, or members of the boards of directors of the Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of directors of the Reorganized Debtors are authorized to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors.

(d)     *Compensation and Benefit Programs.*

(i)     Subject to the Term Sheet and except or to the extent previously assumed or rejected by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit programs of the Debtors as amended or modified, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed except (i) executory contracts or plans as have previously been rejected, are the subject of a

motion to reject or have been specifically waived by the beneficiaries of any plans or contracts; *provided, however*, that the Debtors may pay all retiree benefits as described in section 1114 of the Bankruptcy Code.

(ii)  On the Effective Date, Reorganized NRG will adopt employment arrangements for its officers and executive employees, the general terms of which shall be set forth in the Plan Supplement.  On the Effective Date, management and designated employees of reorganized NRG and the other Reorganized Debtors shall receive the benefits provided under such arrangements on the terms and conditions provided therein.

8.3     *Effectuating Documents and Further Transactions*.  Each of the Debtors or the Reorganized Debtors, as appropriate, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, including the Plan Documents, and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

8.4     *NRG Guaranty Obligations.*  On the Effective Date, the NRG Reinstated Guaranty Obligations shall be reinstated on the same terms and conditions, without impairment or modification.  Obligations of NRG pursuant to NRG Rejected Guaranty Obligations shall constitute NRG Unsecured Claims classified in Class 6 of this Plan.

8.5     *HSR Compliance*.  Any shares of New NRG Common Stock or XEL Stock distributed under the Plan to any entity required to file a premerger notification and report form under the HSR, shall not be distributed until the notification and waiting periods applicable under HSR to such entity have expired or been terminated.  Any filing fees associated with any such New NRG Common Stock filing shall be paid by the Reorganized Debtors.

8.6     *Vesting of Assets*.  On the Effective Date, the respective assets and Estates of the Debtors shall vest in the respective Reorganized Debtors free and clear of all Claims, Liens and Interests, except as provided herein.  As of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan.

8.7     *Liquidation of XEL Stock*.  In the event that Xcel exercises the Xcel Shares Option, and/or the Xcel Downgrade Election the Debtor may liquidate or cause the liquidation of the entire amount of XEL Stock making up any such portion of any  Xcel Distribution and distribute the Xcel Shares Liquidation Proceeds to holders of Allowed Claims in Class 6 and Class 7.

8.8     *[Liquidation of NRG FinCo.*

(a)     *Liquidation*.  All of the NRG FinCo Assets will be sold and the proceeds thereof paid to the holders of NRG FinCo Secured Revolver Secured Claims.  All Claims against the NRG FinCo Secured Revolver Other Collateral shall be treated in accordance with Section IX. I of the Term Sheet.

(b)     .  Holders of NRG FinCo Secured Revolver Recourse Claims shall be entitled to an Allowed Class 6 Claim against NRG in the amount of such Allowed Claim in accordance with Section V.A. of the Term Sheet, pursuant to Section 4.10 of the Plan.

(c)     Holders of NRG FinCo Secured Revolver Deficiency Claims shall be entitled to an Allowed Class 8 Claim in accordance with Section 4.12 herein.]

(d)     NRG FinCo will be merged out of existence.

8.9     *Substantive Consolidation of NRG and PMI.*

(a)     The Debtors reserve the right, subject to the approval by the Bankruptcy Court, to substantively consolidate PMI and NRG for Plan purposes of (i) voting, (ii) determining which Claims and Interests will be

entitled to vote to accept or reject the Plan, (iii) confirmation of the Plan, and (iv) the resultant discharge of and cancellation of Claims and Interests and distributions, interests and other property under the terms of Article IV of the Plan. Substantive consolidation under the Plan will not result in the merger of or the transfer or commingling of any assets of any of the Debtors, and all assets (whether tangible or intangible) will continue to be owned by the respective Debtors, as the case may be.

(b) If PMI and NRG are substantively consolidated, on the Effective Date and for purposes set forth in subsection (a) hereof, (i) all assets and liabilities of PMI will be treated as though they were merged into and with the assets and liabilities of NRG; and (ii) except as otherwise provided in the Plan, no distributions will be made under the Plan on account of intercompany claims between NRG and PMI. Such substantive consolidation of PMI with NRG will not (other than for purposes of the Plan) affect (i) the legal and corporate structures of the Reorganized Debtors, (ii) intercompany claims, (iii) subsidiary interests or (iv) various pre- and post-Petition Date guaranty obligations by NRG that are required to be maintained in connection with executory contracts or unexpired leases that have been or will be assumed pursuant to the Plan.

8.10    *Severability*. At any time prior to the Confirmation Date, the Debtors reserve the right to remove PMI from the Plan and proceed with confirmation of the Plan as amended.

8.11    *Additional Entities*. The Debtors may, subject to the approval of the Committee and the Global Steering Committee, modify the restructuring transactions set forth in this Article VIII in such a manner as they may deem necessary and appropriate in order to effect the internal restructuring set forth in the Plan, including (a) forming additional special purpose affiliates or subsidiaries of the Reorganized Debtors (b) transferring certain assets of the Debtors to the entities formed pursuant to this Section 8.11, and (c) structuring the restructuring transactions as a G-Reorganization.

## ARTICLE IX.
## THE XCEL SETTLEMENT

9.1    *Implementation of Xcel Settlement*. The Confirmation Order shall authorize the consummation and implementation of all of the transactions contemplated by the Xcel Settlement, as set forth in the Term Sheet and Plan Support Agreement, copies of which are attached hereto as Exhibit A and Exhibit B, respectively.

9.2        *Injunctions*. The Confirmation Order shall:

(A)    (I) CONTAIN A FINDING THAT ALL NRG RELEASED CAUSES OF ACTION TO BE SPECIFIED BY XCEL (INCLUDING ALL VEIL PIERCING, ALTER EGO AND SIMILAR CLAIMS AND SUPPORT AGREEMENT CLAIMS) ARE THE EXCLUSIVE PROPERTY OF THE DEBTORS PURSUANT TO SECTION 541 OF THE BANKRUPTCY CODE; (II) CONTAIN A RULING THAT ALL NRG RELEASED CAUSES OF ACTION AND THE SEPARATE BANK CLAIMS AGAINST THE RELEASED PARTIES ARE FULLY SETTLED AND RELEASED UNDER THE PLAN PURSUANT TO BANKRUPTCY RULE 9019 (BUT ONLY TO THE EXTENT THAT SUCH BANKRUPTCY RULE 9019 APPLIES TO THE NRG RELEASED CAUSES OF ACTION AND NOT TO THE SEPARATE BANK CLAIMS); (III) CONTAIN A RULING THAT THE SEPARATE BANK SETTLEMENT PAYMENT IS NOT PROPERTY OF NRG'S CHAPTER 11 ESTATE; AND (IV) PERMANENTLY ENJOIN ANY CREDITOR OF ANY OF THE DEBTORS FROM PURSUING ANY NRG RELEASED CAUSES OF ACTION OR SEPARATE BANK CLAIMS AGAINST ANY OF THE RELEASED PARTIES; AND

(B)    PERMANENTLY ENJOIN ANY PERSON OR ENTITY THAT HOLDS, HAS HELD OR MAY HOLD A CLAIM OR CAUSE OF ACTION RELEASED UNDER THE PLAN FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY NRG RELEASED CAUSES OF ACTION OR THE SEPARATE BANK CLAIMS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (III) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING ANY SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR

OBLIGATION DUE TO ANY RELEASED PERSON OR ENTITY; AND (V) COMMENCING OF CONTINUING ANY ACTION IN ANY MANNER, IN ANY PLACE, THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.

(C)     THE INJUNCTION REFERENCED IN SUBSECTIONS (A) AND (B) OF THIS SECTION 9.2 SHALL BE IN THE FORM ATTACHED HERETO AS <u>EXHIBIT</u>__ AND SHALL BE INCORPORATED INTO THE CONFIRMATION ORDER.

(D)     NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF THE SEPARATE BANK SETTLEMENT PAYMENT IS NOT MADE IN ACCORDANCE WITH THE TERMS OF THE XCEL SETTLEMENT AGREEMENT, THE SEPARATE BANK CLAIMS SHALL NOT BE RELEASED, DISCHARGED OR OTHERWISE IMPAIRED IN ANY WAY BY THE PLAN, THE CONFIRMATION ORDER OR ANY OTHER ORDER IN THE CHAPTER 11 CASE.

9.3     *[RELEASES*

A.      RELEASES BY DEBTORS AND ESTATES.

AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH OF THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, FOR AND ON BEHALF OF THE ESTATES AND ANY PERSON THAT MAY ASSERT A CLAIM OR CAUSE OF ACTION DERIVATIVELY SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, ANY AND ALL OF THE NRG RELEASED CAUSES OF ACTION AGAINST THE RELEASED PARTIES.

[B.      RELEASES BY NRG SUBSIDIARIES THAT ARE DEBTORS AND THEIR ESTATES.

AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH OF THE NRG SUBSIDIARIES THAT IS ALSO A DEBTOR AND DEBTOR IN POSSESSION, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, FOR AND ON BEHALF OF THE BANKRUPTCY ESTATES AND ANY PERSON THAT MAY ASSERT A CLAIM OR CAUSE OF ACTION DERIVATIVELY SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, ANY AND ALL OF THE NRG RELEASED CAUSES OF ACTION AGAINST THE RELEASED PARTIES.]

C.      RELEASES BY THE NON-DEBTOR NRG SUBSIDIARIES.

AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH OF THE NRG SUBSIDIARIES THAT IS NOT A DEBTOR AND DEBTOR IN POSSESSION SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, ANY AND ALL OF THE NRG RELEASED CAUSES OF ACTION AGAINST THE RELEASED PARTIES.

D.      OTHER RELEASES.

EACH HOLDER OF A CLAIM (WHETHER OR NOT ALLOWED) AGAINST, OR EQUITY INTEREST IN, NRG, AND EACH PERSON PARTICIPATING IN EXCHANGES AND DISTRIBUTIONS UNDER OR PURSUANT TO THE PLAN, AND EACH PERSON AFFIRMATIVELY MAKING THE RELEASE ELECTION, SHALL RELEASE ANY AND ALL OF THE NRG RELEASED CAUSES OF ACTION AGAINST THE RELEASED PARTIES.]

E.      EACH HOLDER OF A CLAIM OR AN INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, DIRECT OR INDIRECT SHAREHOLDERS, EMPLOYEES, DIRECTORS, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, OR ANY OF

THEIR SUCCESSORS OR ASSIGNS SHALL BE DEEMED TO HAVE RELEASED AND DISCHARGED, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, ANY AND ALL CAUSES OF ACTION AGAINST THE DEBTORS, THE BANK GROUP, THE GLOBAL STEERING COMMITTEE, THE NOTEHOLDER GROUP, ANY MEMBER OF THE BANK GROUP ACTING IN A CAPACITY AS ADMINISTRATIVE AGENT, XCEL, OR ANY OF THEIR RESPECTIVE PRESENT OR FORMER MEMBERS, OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, ADVISORS, ATTORNEYS OR AGENTS ACTING IN SUCH CAPACITY, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT, GROSS NEGLIGENCE, OR THEIR OBLIGATIONS PURSUANT TO THE PLAN.

## ARTICLE X.
## DISPUTED CLAIMS RESERVE

10.1     *Funding of the Disputed Claims Reserve.* On the Effective Date, the respective number of Reserved Shares, Reserved Notes and Reserved Cash will be placed in the applicable Disputed Claims Reserve by Reorganized NRG for the benefit of holders of Disputed Claims in Class 6 or Class 7 that subsequently become Allowed Claims.

10.2     *ANZ Letter of Credit Reserve.* On the Effective Date, a Pro Rata Share of the Class 6 distributions allocable to the full face amount of NRG Letter of Credit Claims, in respect of which the underlying Letter of Credit has not been drawn as of the Effective Date, shall be placed into the ANZ Letter of Credit Reserve. In the event that an underlying Letter of Credit (or a renewal or extension thereof) is drawn on or after the Effective Date, then, within five (5) Business Days of Reorganized NRG being notified of such drawing, an amount equal to the Pro Rata Share of the Class 6 distributions allocable to the drawn amount of such Letter of Credit shall be distributed from the ANZ Letter of Credit Reserve to the holders of such NRG Letter of Credit Claims in accordance with the procedures for distribution contained herein. In the event that an underlying Letter of Credit expires partially or fully undrawn and the holders of the relevant NRG Letter of Credit Claims no longer have any liability with respect to the expired undrawn portion of such Letter of Credit (or a renewal or extension thereof), then the holders of the relevant NRG Letter of Credit Claims shall no longer be entitled to a distribution with respect to the expired undrawn portion of such Claim and the Pro Rata Share (including any interest and dividends) of the Class 6 distributions allocable to the undrawn portion of the expired Letter of Credit shall be released from the ANZ Letter of Credit Reserve and shall be distributed to the holders of Claims in Class 6 in accordance with Section 4.10 hereof.

10.3     *Property Held in Disputed Claims Reserve; Dividends and Distributions.* Cash dividends and other distributions on account of Reserved Shares to be held in a Disputed Claims Reserve will be transferred to the respective Disputed Claims Reserve concurrently with the transfer of such dividends and other distributions to other holders of New NRG Common Stock. Cash held in a Disputed Claims Reserve as a result of such dividends and other distributions (i) will be deposited in a segregated bank account in the name of the applicable Disbursing Agent and held in trust pending distribution by the Disbursing Agent for the benefit of holders of the respective Class 6 or Class 7 Claims; (ii) will be accounted for separately; and (iii) will not constitute property of the Reorganized Debtors. The Disbursing Agent will invest the Cash held in the Disputed Claims Reserve in a manner consistent with the Reorganized Debtors' investment and deposit guidelines. From and after the Effective Date, the Cash portion of the Disputed Claims Reserve will earn interest at the same rate as if such Cash had been invested in either (A) money market funds consisting primarily of short-term U.S. Treasury securities or (B) obligations of, or guaranteed by, the United States of America or any agency thereof, at the option of the Debtors, and the New NRG Senior Notes will earn interest at their respective coupon rates, in either case, until the Disputed Claim becomes an Allowed Claim. The Disbursing Agent also will place in the Disputed Claims Reserve the Cash investment yield from such investment of Cash, and distributions on account of each Allowed Claim in Class 6 or Class 7 will include a Pro Rata Share of the Cash investment yield from such investment of Cash.

10.4     *Recourse.* Each holder of an Allowed Claim (or a Disputed Claim that ultimately becomes an Allowed Claim) in Class 6 or Class 7 will have recourse only to the Reserved Cash, Reserved Notes and

Reserved Shares (including any interest and dividends) held in the applicable Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims in Class 6 or Class 7 are entitled under the Plan, and not to any Reorganized Debtor, its property or any assets previously distributed on account of any Allowed Claim.

## ARTICLE XI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

11.1    *Prosecution of Objections to Claims.*

(a)    *Objections to Claims.* Subject to Section 4.3 herein, as practicable, but in no event later than [ninety (90)] days after the Effective Date (subject to being extended by the Bankruptcy Court motion of a Debtor with notice and a hearing), all objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline, and, if filed prior to the Effective Date, such objections will be served on the then-applicable service list in the Chapter 11 Case. If an objection has not been filed to a proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.

(b)    *Authority to Prosecute Objections.* After the Effective Date, only the Reorganized Debtors or their successors will have the authority to settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures previously or hereafter approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors or their successors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

11.2    *Treatment of Disputed Claims.* Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. In lieu of distributions under the Plan to holders of Disputed Claims in Class 6 and Class 7 if allowed, the applicable Disputed Claims Reserve will be established on the Effective Date to hold property for the benefit of these Claim holders, as well as holders of Allowed Claims in Class 6 and Class 7. Reorganized NRG will fund each Disputed Claims Reserve with Reserved Cash, Reserved Shares and Reserved Notes as if such Disputed Claims were an Allowed Claim in the Face Amount unless the Claim has been estimated pursuant to Section 11.3.

11.3    *Estimation of Claims.* Subject to Section 4.3 herein, the Debtors or the Reorganized Debtors may, at any time and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Reorganized Debtors, or the Committee (as applicable) previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors, the Reorganized Debtors, or the Committee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

11.4    *Distributions on Account of Disputed Claims Once Allowed.* On each quarterly distribution date, the applicable Disbursing Agent will make all distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class.

11.5    *Tax Requirements for Income Generated by Disputed Claims Reserve.* The recovery of holders of Allowed Claims in a division of Class 6 or Class 7 consists of the treatment set forth herein and the post-Effective

Date interest on the Cash portion of distributions in respect of such Claims, if any, at a rate determined by the Cash investment yield. Therefore, the Reorganized Debtors and the holders of an Allowed Claims in Class 6 or Class 7 will treat Cash distributions of the Cash investment yield as interest for all income tax purposes, and the applicable Reorganized Debtor will cause such information returns to be issued to such holders consistent with this treatment as may be required by any Governmental Entity. The applicable Reorganized Debtor will include in its tax returns all items of income, deduction and credit of the particular Disputed Claims Reserve; *provided, however,* that no distribution will be made to the applicable Reorganized Debtor out of the Disputed Claims Reserves a result of this inclusion. The applicable Disbursing Agent will pay, or cause to be paid, out of the funds held in the applicable Disputed Claims Reserve, any tax imposed on the Disputed Claims Reserve by any governmental unit with respect to income generated by the funds and New NRG Common Stock held in the Disputed Claims Reserve. The applicable Disbursing Agent will file or cause to be filed any tax or information return related to the applicable Disputed Claims Reserve that is required by any Governmental Entity.

<h3 style="text-align:center">ARTICLE XII.<br>CONFIRMATION AND EFFECTIVENESS OF THE PLAN</h3>

12.1    *Conditions Precedent to Confirmation.* The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 12.4 hereof:

(a)     the Bankruptcy Court shall have entered an order or orders, which may be the Confirmation Order, approving the Plan, authorizing the Debtors to execute, enter into and deliver the Plan, and to execute and implement the Plan Documents;

(b)     the Confirmation Order includes a finding of fact that the Debtors, the Reorganized Debtors, Xcel, the Committee, the Global Steering Committee, the Noteholder Group and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are, therefore, not liable for the violation of any applicable law, rule, or regulation governing such actions;

(c)     the Confirmation Order shall be consistent with the Plan, the Term Sheet and the Plan Support Agreement, and shall be in form and substance, acceptable to the Debtors, Xcel, the Global Steering Committee and the Committee;

(d)     the Xcel Settlement Agreement shall be in full force and effect;

(e)     the Xcel Settlement Approval Order [or, Confirmation Order] shall, among other things, approve in all respects the Xcel Settlement Agreement and the compromises and transactions contemplated thereby and contain findings and conclusions in support of the components thereof that are satisfactory to Xcel;

(f)     the following persons shall have exercised the Release Election:

(i) holders of a majority in number representing 85% in principal amount outstanding in respect of the Note Claims, including 100% of the Noteholder Group (to the extent they still hold Note Claims at the time);

(ii) holders of a majority in number representing 85% in principal amount outstanding in respect of each of the NRG Unsecured Revolver Claims, NRG Letter of Credit Facility Claims and the NRG FinCo Secured Revolver Claims, including 100% of the Global Steering Committee;

(iii) 100% of the members of the Separate Bank Settlement Group; and

(iv) holders of 85% in amount of all NRG Unsecured Claims;

(g)     neither the Plan nor any documents comprising the Plan Supplement shall have been amended, altered or modified in any way from the Plan as filed on May 17, 2003, and the Plan Supplement filed on

_____ unless such amendment, alteration or modification has been consented to in accordance with Section 15.8;

(h)     all Exhibits to the Plan and all documents comprising the Plan Supplement are in form and substance satisfactory to (i) the Debtors; (ii) the Committee; (iii) Xcel; and (iv) the Global Steering Committee; and

(i)     no litigation that is the subject of an NRG Released Cause of Action is currently pending by any party releasing such actions pursuant to Section 9.3.

12.2     *Conditions Precedent to Effectiveness.*  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 12.4 hereof:

(a)     the Effective Date shall have occurred on or before December 15, 2003;

(b)     all actions, documents and agreements necessary to implement the Plan shall have been effected or executed;

(c)     the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtors to be necessary to implement the Plan;

(d)     the Confirmation Order shall have been entered, the Confirmation Date shall have occurred, and the Confirmation Order shall be in full force and effect and shall not have been stayed or modified;

(e)     the Xcel Settlement Approval Order shall have been entered, shall have become a Final Order, shall not have been modified and shall be in full force and effect;

(f)     all conditions to consummation of the transactions contemplated by the Xcel Settlement Agreement shall have been satisfied or waived pursuant to the terms thereof, the effective date under the Xcel Settlement Agreement shall have occurred and the Xcel Settlement Agreement shall be in full force and effect;

(g)     all Plan Documents and any amendments thereto shall be in a form and substance satisfactory to (i) the Debtor; (ii) the Committee; (iii) the Global Steering Committee and (iv) Xcel;

(h)     no litigation that is the subject of an NRG Released Cause of Action shall be currently pending;

(i)     the Plan shall not have been amended, altered or modified from the Plan as approved by the Confirmation Order, unless such amendment, alteration or modification has been consented to in accordance with Section 15.8; and

(j)     the Releases, or Release Election, as applicable, set forth in Sections 9.3 and 12.1(f), respectively, shall be fully enforceable and effective.

(k)     The Global Steering Committee and the Committee shall be satisfied with the identity, composition and employment terms of the NRG senior management team, *provided however* if such identity, composition and employment terms have been determined in connection with Section IX C of the Term Sheet this provision shall be deemed satisfied.

12.3     *Effect of Failure of Conditions.*  In the event that one or more of the conditions specified in Section 12.2 hereof shall not have occurred or been waived pursuant to Section 12.4 on or before December 15, 2003, (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Order had never been entered, and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained herein shall

constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any Person or Governmental Entity or to prejudice in any manner the rights of the Debtors or any Person or Governmental Entity in any further proceedings involving the Debtors; *provided, however,* that the amounts paid pursuant to Section 4.2 hereof on account of Post-Petition Interest may be recharacterized as a payment upon the applicable Allowed Claims, in the sole discretion of the Debtors, but the Debtors will not otherwise seek to recover such amounts.

12.4    *Waiver of Conditions.* Conditions to confirmation and effectiveness of the Plan may be waived only by the Debtors, with the consent of the Required Parties.

## ARTICLE XIII.
## EFFECT OF CONFIRMATION OF PLAN

13.1    *Term of Bankruptcy Injunction or Stays.* Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case under section 105 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date shall remain in full force and effect in accordance with the terms of such injunctions. Unless otherwise provided, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in full force and effect until the Effective Date.

13.2    *Claims Extinguished.* As of the Effective Date, any and all avoidance claims accruing to the Debtors under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code and not then pending, shall be extinguished.

13.3    *Discharge of Debtors.* The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of its assets or properties. Except as otherwise provided herein, (i) as of the Confirmation Date, all such Claims against and Equity Interests in the Debtors shall be satisfied, discharged and released in full and (ii) all Persons and Governmental Entities shall be precluded from asserting against the Debtors, its successors, or its assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

13.4    *Injunction.* In addition to and except as otherwise expressly provided herein, the Confirmation Order or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in the Debtors, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtors, or their respective subsidiaries or affiliates on account of any such Claim or Equity Interest; (iii) creating, perfecting or enforcing any Lien of any kind against the Reorganized Debtors, or their respective subsidiaries or affiliates or against the property or interests in property of the Reorganized Debtors, or their respective subsidiaries or affiliates on account of any such Claim or Equity Interest; (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtors, or their respective subsidiaries or affiliates or against the property or interests in property of the Reorganized Debtors, or their respective subsidiaries or affiliates on account of any such Claim or Equity Interest; and (v) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims or Causes of Action which are extinguished, dismissed or released pursuant to the Plan. The injunction shall also enjoin all parties in interest, including all entities who have held, hold or may hold Claims against or Equity Interests in the Debtors, from taking any action in violation of the Confirmation Order. Such injunction shall extend to successors of the Reorganized Debtors, or their respective subsidiaries or affiliates, their respective properties and interests in property. Except as provided by Article IX, this Section 13.4 shall not enjoin, bar or otherwise impair the commencement or prosecution of direct personal claims against any Person other than the Reorganized Debtors, and their respective subsidiaries or affiliates. Notwithstanding anything to the contrary herein, nothing in the Plan shall be deemed to impair any Claims or other rights against Nondebtor Subsidiaries.

## ARTICLE XIV.
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of cure amounts and Claims resulting therefrom;

(b) to hear and determine any and all adversary proceedings, applications and contested matters;

(c) to hear and determine any objection to Administrative Expense Claims or Claims;

(d) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e) to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f) to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(g) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or Confirmation Order;

(i) to hear and determine proceedings to recover assets of the Debtors and property of the Debtors' Estate, wherever located;

(j) to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k) to hear and determine matters concerning the Disputed Claims Reserve, if any, established pursuant to the terms of the Plan;

(l) to hear any other matter not inconsistent with the Bankruptcy Code; and

(m) to enter a final decree closing the Chapter 11 Case.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

15.1 *Effectuating Documents and Further Transactions.* The Debtors (or the Reorganized Debtors after the Effective Date), Xcel and their respective subsidiaries and affiliates are each authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, including the Plan Documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

15.2 *Exemption from Transfer Taxes.* Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or the issuance of equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making

or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate, transfer, mortgage recording, use or other similar tax.

15.3     *Exculpation and Limitation of Liability.*  None of the Debtors, the Bank Group, the Global Steering Committee, the Noteholder Group, any member of the Bank Group acting in a capacity as administrative agent, Xcel, or any of their respective present or former members, officers, directors, shareholders, employees, advisors, attorneys or agents acting in such capacity, shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, direct or indirect shareholders, employees, directors, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their will misconduct or gross negligence, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however,* that nothing herein shall exculpate from any obligation of any Debtor to indemnify its current and former directors or officers under its organizational documents, by-laws, employee indemnification policies, state law, or any other agreement.

15.4     *INJUNCTION RELATED TO RELEASES AND EXCULPATION.*  EXCEPT AS OTHERWISE SET FORTH IN THE PLAN, THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED PURSUANT TO THE PLAN, INCLUDING BUT NOT LIMITED TO THE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED OR SUBJECT TO EXCULPATION PURSUANT TO THE TERMS OF THIS PLAN.

15.5     *Committee Termination.*  The appointment of any committee in the Chapter 11 Case shall terminate on the Effective Date, subject to continuation for specific purposes by a Final Order of the Bankruptcy Court.

15.6     *Fees and Expenses.*  From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional Persons thereafter incurred, including those fees and expenses incurred in connection with the implementation and consummation of the Plan.

15.7     *Payment of Statutory Fees.*  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

15.8     *Amendment or Modification of the Plan.*  The Debtors may alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing, with the written consent of the Committee, the Global Steering Committee and Xcel.  The Debtors may alter, amend or modify any Exhibits to the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing, with the written consent of the Committee, the Global Steering Committee and Xcel.  After the Confirmation Date, and prior to substantial consummation of the Plan with respect to any Debtor as defined in section 1102 of the Bankruptcy Code, any Debtor may, with the written consent of the Committee, the Global Steering Committee and Xcel, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

15.9     *Revocation or Withdrawal of the Plan.*  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a

waiver or release of any claims by or against the Debtors or any other Person or Governmental Entity or to prejudice in any manner the rights of the Debtors or any Person or Governmental Entity in any further proceedings involving the Debtors.

15.10   *Binding Effect*.  The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors and their respective subsidiaries and affiliates, the holders of Claims and Equity Interests, other parties in interest, and their respective successors and assigns.

15.11   *Notices*.  All notices, requests and demands to or upon the Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

*If to the Debtors or the Reorganized Debtors*:

NRG Energy, Inc.
901 Marquette Avenue
Suite 2300
Minneapolis, Minnesota 55402
Attn: Scott J. Davido, Esq.
Telephone: (612) 373-5300
Facsimile: (612) 373-5392

*with a copy to*:

Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Attn: Matthew A. Cantor, Esq.
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*If to the Noteholder Group:*

Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103-3178
Attn: Evan D. Flaschen, Esq.
Telephone: (860) 240-2700
Facsimile: (860) 240-2800

*If to the Global Steering Committee*:

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, New York 10017
Attn: Peter V. Pantaleo, Esq.
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*If to Xcel*:

Gary Johnson, Esq.
Xcel Energy Inc.
800 Nicolett Mall
30th Floor
Minneapolis, Minnesota 55402
Telephone:
Facsimile:

Brad B. Erens, Esq.
Jones Day
77 West Wacker
Chicago, Illinois 60601-1692
Telephone: (312) 269-4050
Facsimile: (312) 782-8585

Brian E. Greer, Esq.
Jones Day
222 East 41st Street
New York, New York 10017-6702
Telephone: (212) 326-8322
Facsimile: (212) 755-7306

*If to* [ANY OTHER COMMITTEE OFFICIALLY APPOINTED IN THIS CASE]:

**[INSERT NAME & CONTACT INFO]**

*If to the United States Trustee*:

The Office of the United States Trustee
333 Whitehall Street
New York, New York 10004
Telephone: (212) 510-0500
Facsimile: (212) 668-2255

15.12  *Governing Law*.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

15.13  *Withholding and Reporting Requirements*.  Except as otherwise provided by the Plan, in connection with the consummation of the Plan, the Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

15.14  *Exhibits/Schedules*.  All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

15.15  *Plan Supplement*.  The Plan Supplement, which shall include certain exhibits, lists, schedules, supplements, or other documents to be executed in connection with the Plan (as shall be agreed to or amended by NRG, the Global Steering Committee, the Noteholder Group, the Committee and Xcel), shall be filed with the Bankruptcy Court not later than ten (10) days before the Confirmation Hearing.  Upon its filing, the Plan Supplement may be inspected in the offices of the Clerk or such Clerk's designee during normal business hours.

The documents contained in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

15.16    *Subrogation Rights.*  Nothing in the Plan shall affect (i) the subrogation rights of any surety, to the extent applicable or available, which, if available or applicable, shall remain in full force and effect or (ii) the rights of the Debtors to object, pursuant to the Bankruptcy Code, to the existence of such subrogation rights.

DATED:  May 14, 2003

Respectfully submitted,

NRG ENERGY, INC., on its own behalf and on behalf of each of the Debtors and Debtors in Possession

By:
Name:    Scott J. Davido
Title:    Senior Vice President and General Counsel

KIRKLAND & ELLIS
Proposed Reorganization Counsel to the Debtors and
Debtors in Possession

Citigroup Center
153 East 53rd Street
New York, New York  10022-4675
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

**EXHIBIT A**

**[INSERT TERM SHEET HERE]**

**EXHIBIT B**

**[INSERT PSA HERE]**

## EXHIBIT C

**[INSERT SCHEDULE OF NRG PUBLIC NOTES -- OR REFERENCE IN THE TEXT TO OTHER DOC.]**

# EXHIBIT D

## [SEPARATE BANK CLAIMS GROUP]

## EXHIBIT E

[SCHEDULE OF NRG FINCO ASSETS]

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

Execution Copy

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of May 13, 2003 by and among (i) NRG Energy, Inc. ("**NRG**"), (ii) certain of NRG's subsidiaries and affiliates as set forth on **Schedule 1-A** (the "**Relevant NRG Subsidiaries**" and, together with NRG, the "**NRG Group**"), (iii) Xcel Energy Inc. ("**Xcel**"), (iv) the persons identified on **Schedule 1-B** (collectively, the "**Supporting Noteholders**") and (v) the persons identified on **Schedule 1-C** who are signatories to this Agreement (collectively, the "**Supporting Lenders**", and together with the Supporting Noteholders, the "**Supporting Creditors**") (the NRG Group, Xcel and the Supporting Creditors, collectively, the "**Parties**" and individually, a "**Party**").

## RECITALS

WHEREAS:

A.      NRG has issued from time to time the several series of senior notes and other instruments described on **Schedule 2-A** (collectively, the "**Senior Notes**");

B.      One or more of the NRG Group members is a borrower or account party in respect of the credit facilities and other financial obligations described on **Schedule 2-B** (the "**Lender Facilities**");

C.      Each NRG Group member is contemplating a restructuring of its financial obligations through the prosecution of jointly administered chapter 11 cases (collectively, the "**Chapter 11 Cases**"; the court adjudicating the Chapter 11 Cases is referred to as the "**Bankruptcy Court**");

D.      The Parties have reached an agreement in principle on the terms and conditions (i) of the NRG Plan (as defined in the Term Sheet, as defined below) (such plan together with all plan related documents, agreements, supplements and instruments, the "**NRG Plan**"); and (ii) regarding the settlement of claims and causes of action the NRG Group and other parties in interest in the Chapter 11 Cases have asserted or could assert against Xcel; such terms and conditions being set forth in the Term Sheet Concerning NRG Plan And Relationship With Xcel Energy Inc. (the "**Term Sheet**") attached hereto as **Exhibit A**;

E.      The NRG Group and the Supporting Creditors acknowledge and agree that the best way to proceed to effectuate the NRG Plan is to do so in a way that would:

1.      maximize the value of the NRG Group for the benefit of all interested persons;

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

      2.      minimize the disruption to the NRG Group resulting from the commencement of the Chapter 11 Cases, by seeking to conclude the Chapter 11 Cases as quickly as possible; and

      3.      facilitate the NRG Group's ability to obtain postpetition financing and post-reorganization financing on favorable terms, in order to minimize the cost, conditions and restrictions thereof to the NRG Group;

F.      The Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet, including the consummation of the NRG Plan consistent therewith; and

G.      In expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, the fiduciary duties of the members of the NRG Group as debtors in possession, the fiduciary duties of any Supporting Creditor who is appointed to the official committee of unsecured creditors (the "**Creditors' Committee**") in the Chapter 11 Cases or the role of any state or federal agencies with regulatory authority concerning any member of the NRG Group.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. *Defined Terms.* All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.

2. *Term Sheet Conditions.* Without limiting the conditions set forth herein, each Party's agreement to this Agreement and support for the NRG Plan and the Term Sheet is expressly conditioned on satisfaction of each of the terms and conditions set forth in the Term Sheet and this Agreement. To the extent any such conditions involve a time period or an outside date for satisfaction, the Parties acknowledge and agree that time is of the essence with respect to each such condition.

3. *NRG Group's Support.* The NRG Group believes that consummation of the NRG Plan will best facilitate its business and financial restructuring and that consummation of the settlements described in the Term Sheet is in its best interests and in the best interests of its creditors and other parties in interest. Accordingly, the NRG Group hereby expresses its intention to file and seek confirmation of the NRG Plan consistent with the terms and provisions

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

of the Term Sheet. Without limiting the foregoing, the NRG Group intends, for so long as this Agreement remains in effect:

      a. to submit for, and use its best efforts to obtain at the earliest practicable date, Bankruptcy Court approval of a disclosure statement (as approved by the Bankruptcy Court, the "**Disclosure Statement**") in form and substance satisfactory to Xcel and the Supporting Creditors;

      b. to use its best efforts to solicit the requisite votes in favor of, and to obtain confirmation by the Bankruptcy Court at the earliest practicable date of, the NRG Plan in form and substance satisfactory to Xcel and the Supporting Creditors and approval by the Bankruptcy Court of the settlement set forth in the Term Sheet;

      c. not to pursue, propose or support, or encourage the pursuit, proposal or support of, any plan of reorganization for any member of the NRG Group that is not consistent with the Term Sheet and the NRG Plan; and

      d. to otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by the Term Sheet and by the NRG Plan at the earliest practicable date (including opposing any appeal of the Confirmation Order and using its best efforts to resolve, or have the Bankruptcy Court determine, all issues (if any) concerning the dollar amount of all Noteholder claims, all Bank Group claims, including claims under the Lender Facilities, and all recourse claims of any bank lender against NRG prior to the commencement of the hearing on the Disclosure Statement for the NRG Plan in accordance with the provisions of the Term Sheet);

in all events expressly subject to the exercise by NRG and each other member of the NRG Group of its fiduciary duties as debtors in possession in the Chapter 11 Cases.

    4. *Xcel's Support.* Xcel hereby expresses its commitment to and its intention to implement the Term Sheet in accordance with its terms and subject to its conditions. Without limiting the foregoing, Xcel intends and commits, for so long as this Agreement remains in effect:

      a. to support the NRG Plan and, as reasonably requested, to assist NRG in the preparation of the Disclosure Statement;

      b. not pursue, propose, support, or encourage the pursuit, proposal or support of, any chapter 11 plan, or other restructuring or reorganization for any member of the NRG

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

Group (directly or indirectly) that is not consistent with the Term Sheet and the NRG Plan;

c. not, nor encourage any other person or entity, to interfere with, delay, impede, appeal or take any other negative action, directly or indirectly, in any respect regarding acceptance or implementation of the NRG Plan;

d. to use its commercially reasonable efforts to comply with the terms and provisions of the Term Sheet applicable to Xcel and to obtain any necessary regulatory and other approvals pertaining thereto; and

e. to cooperate in consummating and making effective the transactions contemplated by the Term Sheet and the NRG Plan at the earliest practicable date;

in each case consistent with the terms and provisions of the Term Sheet, but in all events expressly subject to any federal or state regulatory approvals and requirements and to the fiduciary duties in the Chapter 11 Cases of any director or officer of any member of the NRG Group who is also a director or officer of Xcel.

5. *Supporting Creditors' Claims and Support.* Each Supporting Noteholder represents and warrants, on a several but not joint basis, that, as of the date hereof, it is the legal or beneficial holder of, or holder of investment authority over, the Senior Notes identified on its signature page hereto (collectively, such Supporting Noteholder's **"Relevant Notes"**) and has or will have the authority to vote or direct the voting of claims relating to the Relevant Notes. Each Supporting Lender represents and warrants, on a several but not joint basis, that, as of the date hereof, it is the legal or beneficial holder of claims pursuant to the Lender Facilities identified on its signature page hereto (collectively, such Supporting Lender's **"Relevant Debt"**; all Supporting Creditors' Relevant Notes and Relevant Debt, collectively, the **"Relevant Claims"**) and has or will have the authority to vote or direct the voting of claims relating to the Relevant Debt. Each Supporting Creditor believes that consummation of the NRG Plan consistent with the Term Sheet is in its best interests. Accordingly, each Supporting Creditor will support the NRG Plan consistent with the terms and conditions of the Term Sheet. Without limiting the foregoing, each Supporting Creditor commits to (subject to paragraph 9 hereof), for so long as this Agreement remains in effect:

a. support the NRG Plan and use its commercially reasonable efforts to facilitate the filing and confirmation of the NRG Plan at the earliest practicable date;

b. not pursue, propose, support, or encourage the pursuit, proposal or support of, any chapter 11 plan, or other restructuring or reorganization for any member of the NRG Group (directly or indirectly) that is not consistent with the Term Sheet and the NRG Plan;

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

      c. not, nor encourage any other person or entity, to interfere with, delay, impede, appeal or take any other negative action, directly or indirectly, in any respect regarding acceptance or implementation of the NRG Plan;

      d. not commence any proceeding or prosecute any objection to oppose or object to the NRG Plan or to the Disclosure Statement, and not to take any action that would delay approval or confirmation, as applicable, of the Disclosure Statement and the NRG Plan; *provided, however*, that the Supporting Creditor may object to the disclosure statement solely on the basis that it does not contain adequate information as required by section 1125 of the Bankruptcy Code;

      e. elect on any ballot distributed in connection with and pursuant to the NRG Plan to affirmatively release any and all NRG Released Causes of Action and, as applicable, any Separate Bank Claims, that it has or may have against Released Parties; and

      f. use its commercially reasonable efforts to resolve, or have the Bankruptcy Court determine, all issues (if any) concerning the dollar amount of all Noteholder claims, all Bank Group claims, including claims under the Lender Facilities, and all Bank project lender recourse claims against NRG prior to the commencement of the hearing on the Disclosure Statement for the NRG Plan in accordance with the provisions of the Term Sheet)

in each case consistent with the terms and provisions of the Term Sheet; *provided, however*, that notwithstanding anything herein to the contrary, if any Supporting Creditor is appointed to and serves on the Creditors' Committee, the terms of this Agreement shall not be construed to limit such Supporting Creditor's exercise of its fiduciary duties in its role as a member of a Creditors' Committee, and any exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.

     6. *Acknowledgement.* While the Supporting Creditors (subject to paragraph 9 hereof) commit herein to support the NRG Plan and it is their intention to vote in favor of the NRG Plan, this Agreement is not and shall not be deemed to be a solicitation for consent to the NRG Plan. The acceptance of the Supporting Creditors will not be solicited until the Supporting Creditors have received the Disclosure Statement and the related ballots in forms approved by the Bankruptcy Court.

     7. *Limitations on Transfer.* Each Supporting Creditor hereby agrees not to (a) sell, transfer, assign, pledge, or otherwise dispose, directly or indirectly their right, title or interest in respect of the Relevant Claims, in whole or in part, or any interest therein, or (b) grant any proxies, deposit any of its claims into a voting trust, or enter into a voting agreement with respect to any of such claims (clauses (a) and (b), collectively, a **"Transfer"**) unless such transferee

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

agrees in writing at the time of such Transfer to be bound by this Agreement in its entirety without revisions. Any Transfer that does not comply with this paragraph shall be void *ab initio*. In the event of a Transfer, the transferor shall, within three business days, provide written notice of such transfer to Xcel and NRG, together with a copy of the written agreement of the transferee to be bound by this Agreement in its entirety without revision. Upon compliance with the foregoing, the transferee shall be deemed to constitute a Supporting Noteholder or a Supporting Lender, as the case may be. No Supporting Lender or Supporting Noteholder may create any subsidiary or affiliate for the sole purpose of acquiring any Lender Facilities or Senior Notes without first causing such subsidiary or affiliate to become a party hereto as a Supporting Lender or Supporting Noteholder, as the case may be.

8. *Further Acquisition of Senior Notes and Lender Facilities.* This Agreement shall in no way be construed to preclude any Supporting Noteholder from acquiring additional Senior Notes or claims in respect of the Lender Facilities or any Supporting Lender from acquiring additional claims in respect of the Lender Facilities or Senior Notes. However, any such Senior Notes and claims so acquired shall automatically be deemed to be Relevant Claims and to be subject to all of the terms of this Agreement other than paragraph 7 hereof.

9. *Other Claims Held by Supporting Creditors.* Notwithstanding anything herein to the contrary, the agreements and other obligations of each Supporting Creditor hereunder apply only with respect to such Supporting Creditor's Relevant Claims and do not apply to, and shall have no effect in respect of, any Unrestricted Claims such Supporting Creditor has or may have against any member of the NRG Group. For the purposes of this paragraph 9, "**Unrestricted Claims**" shall mean claims held by a Supporting Creditor against any member of the NRG Group other than such Supporting Creditor's Relevant Claims.

10. *Condition to each Party's Obligations.* Each Party's obligations under this Agreement are subject to the satisfaction of the following condition:

Each of the following persons shall have executed this Agreement:

      a.      each member of the NRG Group;.

      b.      Xcel;

      c.      the Supporting Noteholders who shall represent a majority in principal amount outstanding of the Senior Notes; and

      d.      the Supporting Lenders, who shall represent at least two-thirds in principal amount outstanding and a majority in number of the lenders under each of the NRG Revolver, the L/C Facility and the Finco Credit Agreement (for the purposes of this Agreement, the "principal amount outstanding" in respect of the L/C Facility shall be deemed to constitute the aggregate amount of all funded and unreimbursed draws in

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

respect of the L/C Facility together with the face amount of all available but undrawn amounts under the L/C Facility).

11. *Additional Conditions to Xcel's Obligations.* Xcel's obligations under this Agreement are also subject to the satisfaction of the following conditions unless the failure of such condition is the result of Xcel's own breach of this Agreement:

a. the Petition Date shall have occurred no later than May 14, 2003;

b. the NRG Group shall have used its reasonable best efforts, with the support of the Supporting Creditors, to cause the entry of an order by the Bankruptcy Court no later than 30 days after the Petition Date, and in form acceptable to Xcel, setting a bar date for all claims against the NRG Entities no later than 60 days after the Petition Date (with the schedules and statement of financial affairs of all NRG Entities to be filed by 30 days after the Petition Date);

c. the NRG Group shall have used its reasonable best efforts, with the support of the Supporting Creditors, to cause the entry of an order by the Bankruptcy Court no later than 45 days after the Petition Date approving the Disclosure Statement;

d. the NRG Group shall have used its reasonable best efforts, with the support of the Supporting Creditors, to obtain the requisite votes in favor of the NRG Plan no later than 90 days after the Petition Date (the "**Voting Deadline**") and shall have received the requisite votes from the Unsecured Creditor Class to confirm the NRG Plan;

e. the Supporting Creditors shall have voted to accept the NRG Plan no later than the Voting Deadline (it being recognized that, while this is a condition to Xcel's obligations under this Agreement, and without derogation of the support and commitment of the Supporting Creditors set forth in paragraph 5 above, it is not a solicitation of the votes of the Supporting Creditors and it is not a vote by the Supporting Creditors to accept the NRG Plan) and such vote has not been revoked or withdrawn;

f. 100% of the members of the Separate Bank Settlement Group shall have executed and delivered the Separate Bank Settlement Release no later than the Effective Date of the NRG Plan;

g. the following persons shall have released the Released Parties from all NRG Released Causes of Action by "checking the box" (as described in section V.C of the Term Sheet) no later than the Voting Deadline:

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

1.      holders of a majority in number representing 85% in principal amount outstanding of the claims in respect of the Senior Notes, including 100% of the Supporting Noteholders;

2.      holders of a majority in number representing 85% in principal amount outstanding of the claims in respect of each of the NRG Revolver, the L/C Facility and the Finco Credit Agreement, including 100% of the Supporting Lenders;

3.      100% of the members of the Separate Bank Settlement Group; and

4.      holders of 85% in amount of all claims in the Unsecured Creditor Class;

h.  the entry on the docket of the Bankruptcy Court of the Confirmation Order, which shall (i) fully incorporate all of the relevant provisions of the Term Sheet (including the releases and injunctions described above) and any other matters agreed to in writing by Xcel, (b) not contain any provisions inconsistent with the Term Sheet or such other matters (other than a provision to which Xcel has previously consented to in writing), and (c) not approve any amendments or supplements to such NRG Plan (other than amendments or supplements to which Xcel has previously consented to in writing) which Xcel determines to be adverse to it in its sole reasonable discretion, which the NRG Group shall use its reasonable best efforts to cause to occur no later than 110 days after the Petition Date;

i.  the receipt by Xcel, and, to the extent applicable, NRG of all regulatory and other approvals (including any approvals from the Federal Energy Regulatory Commission, the Securities and Exchange Commission and any state Public Utility Commission) necessary for Xcel and, to the extent applicable, NRG to perform such obligations set forth for Xcel in the Term Sheet and such NRG Plan;

j.  the Effective Date for such NRG Plan approved by such Confirmation Order referenced in paragraph 11.h hereof, and the satisfaction of all of the other conditions set forth in this paragraph 11, occurring by no later than December 15, 2003;

k.  all other Parties to this Agreement having fulfilled their respective obligations under this Agreement in all respects and no such Party having breached any of its obligations under this Agreement;

l.  each of the Supporting Lenders that has a claim against Xcel under any Xcel credit facility (the **"Cross-Over Lenders"**) shall approve, without payment of any special fee or expense, any waiver or amendment that Xcel and the administrative agent under such credit facility believe is necessary under such credit facility to implement this

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

Agreement, the NRG Plan and the transactions contemplated thereby, including with respect to the establishment of the Tax Escrow (except that if other lenders to Xcel under any credit facility shall receive a special fee or expense for their waiver or amendment, the Cross-Over Lenders shall be entitled to the same pro rata fee or expense), and, in any case, such waiver or amendment is obtained by Xcel prior to the Effective Date; and

m. NRG shall not have violated the provisions of Section VI.B(B) of the Term Sheet.

Should any of such conditions, or any other conditions to the performance of any obligation of Xcel in this Agreement, not be timely fulfilled or waived by Xcel, any obligations of Xcel set forth in this Agreement shall be null and void *ab initio* and all Xcel Released Causes of Action and any other claims, causes of action, remedies, defenses, setoffs, rights or other benefits of Xcel shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

12. *Termination Events.* The occurrence of each of the following events shall constitute a "**Termination Event**":

a. NRG's Chapter 11 Case (other than an involuntary bankruptcy case for which an order for relief has not been entered) shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

b. Xcel shall have disclaimed in writing its intention to fulfill its obligations under this Agreement, or Xcel shall fail to fulfill any or all of its obligations under this Agreement;

c. the failure of the condition set forth in paragraph 10 of this Agreement;

d. the breach or failure of any of the conditions set forth in paragraphs 11.a. through 11.m. of this Agreement;

e. any Court (including the Bankruptcy Court) shall declare, in a Final Order, this Agreement to be unenforceable;

f. the most current NRG Plan and the Disclosure Statement on file with the Bankruptcy Court on or after 30 days from the Petition Date (and any amendments, supplements and documents related to such pleadings filed after such 30 period) shall (i) not be in form and substance satisfactory to each Party, (ii) not be consistent with and fully incorporate the terms and provisions of the Term Sheet or (iii) contain any provisions inconsistent with the Term Sheet;

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

g. (A) after giving effect to Section V.A(2) of the Term Sheet, to the extent applicable, the Parties shall have failed to resolve, or shall have failed to agree to a procedure for resolving, all issues (if any) concerning any claims asserted or assertable, directly or indirectly, by the lenders under the Finco Credit Agreement (in their capacity as such) against NRG or any of its subsidiaries prior to June 17, 2003 or (B) such lenders shall have failed to file a proof of claim in the Chapter 11 Cases with respect all such claims on or prior to June 3, 2003;

h, the Required Parties (as defined below) shall not have reached agreement by July 31, 2003 on whether, and the terms under which, Xcel will escrow Tax Benefits (as defined in the Term Sheet); and

i. January 1, 2004.

13. *Termination of this Agreement.* Upon the occurrence of a Termination Event, this Agreement shall terminate (except for a Termination Event described in paragraph 12.f or 12.g, for which the Termination Event shall only terminate this Agreement with respect to the Party invoking such Termination Event unless a "Required Party" invokes such Termination Event) as follows:

a. immediately upon the occurrence of the Termination Events set forth in paragraph 12.c, 12.h or 12.i unless the date referenced therein is, prior to the expiration of such date, extended in writing by each of (i) Xcel, (ii) the NRG Group, (iii) holders of two-thirds in principal amount outstanding of the Relevant Notes (the "**Required Noteholders**"), and (iv) holders of two-thirds in principal amount outstanding of the Relevant Debt (the "**Required Lenders**") (each of the persons or groups of persons described in each of the foregoing clauses (i) through (iv) a "**Required Party**" and, collectively, the "**Required Parties**");

b. immediately upon the occurrence of the Termination Events set forth in paragraphs 12.e, 12.f or 12.g (but only with respect to the Party invoking the Termination Event described in paragraph 12.f or 12.g unless a Required Party invokes such Termination Event) of this Agreement;

c. 30 calendar days after the occurrence of the Termination Events described in paragraph 12.a and 12.b of this Agreement, unless either (i) the occurrence of the event giving rise to the Termination Event is no longer continuing on such 30th day or (ii) each of the Required Noteholders, Required Lenders, and, for purposes of paragraph 12.a, Xcel, shall have waived in writing such Termination Event; *provided, however,* that for the purposes of this clause 13.c, if such event has occurred as a result of an action taken or omitted to be taken by a Supporting Creditor, the claims of such Supporting Creditor

PAGE 11

shall not be included in the calculation of the "Required Noteholders" or the "Required Lenders," as the case may be; and

d. 30 calendar days after the occurrence of the Termination Event described in paragraph 12.d of this Agreement, unless (i) the event giving rise to the Termination Event occurred as a result of an action taken or omitted to be taken by Xcel or (ii) Xcel modifies or waives in writing such Termination Event.

14. *Effect of Termination.* Upon termination of this Agreement (which in the case of a Termination Event described in paragraph 12.f or 12.g, upon termination of this Agreement only with respect to the Party invoking such Termination Event unless a "Required Party" invokes such Termination Event), all obligations hereunder shall terminate and shall be of no further force and effect; *provided however,* that any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; but *provided further,* that the breach of this Agreement by one or more Supporting Creditors shall not create any rights or remedies against any non-breaching Supporting Creditor unless such non-breaching Supporting Creditor has participated in or aided and abetted the breach by the breaching Supporting Creditor(s). Except as set forth above in this paragraph 14 and for the obligations set forth in paragraph 16 hereof, upon such termination, any obligations of the non-breaching Parties set forth in this Agreement shall be null and void *ab initio* and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

15. *Representations and Warranties.* NRG, Xcel and each Supporting Creditor, on a several but not joint basis, represents and warrants to each other Party that the following statements are true, correct and complete as of the date hereof:

a. *Corporate Power and Authority.* It is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership or other power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

b. *Authorization.* The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part.

c. *Binding Obligation.* This Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof.

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

d. *No Conflicts.* The execution, delivery and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

e. *Adequate Information.* Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the NRG Plan, they each acknowledge and agree that, regardless of whether its Relevant Claims constitute "securities" within the meaning of the Securities Act of 1933, (i) each of the Supporting Creditors is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933 and a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act of 1933 and (ii) adequate information was provided by the NRG Group and Xcel to each Supporting Creditor in order to enable it to make an informed decision such that, were this Agreement to be construed as or deemed to constitute such a solicitation and acceptance, such solicitation was (i) in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, or (ii) if there is not any such law, rule, or regulation, solicited after disclosure to such holder of "adequate information" as such term is defined in section 1125(a) of the Bankruptcy Code.

16. *Confidentiality.* NRG, Xcel and each Supporting Creditor agrees to use commercially reasonable efforts to maintain the confidentiality of (a) the individual identities of the Supporting Creditors or (b) the individual holdings of the Supporting Creditors; *provided, however,* that such information may be disclosed (i) to the Parties' respective directors, trustees, executives, officers, auditors, and employees and financial and legal advisors or other agents (collectively referred to herein as the **"Representatives"** and individually as a **"Representative"**), (ii) to persons in response to, and to the extent required by, (x) any subpoena, or other legal process or (y) the NAIC, any bank regulatory agency or any other regulatory agency or authority. If any Party or its Representative receives a subpoena or other legal process as referred to in clause (ii)(x) above in connection with the Agreement, such Party shall provide the other Parties with prompt written notice of any such request or requirement, to the fullest extent permissible and practicable under the circumstances, so that the other Parties may seek a protective order or other appropriate remedy or waiver of compliance with the provisions of this Agreement. Notwithstanding the provisions in this paragraph 16, (i) Xcel and NRG may disclose (a) the existence of and nature of support evidenced by this Agreement in one or more public releases that have first been sent to counsel for the Supporting Noteholders and counsel for the Global Steering Committee for review and comment, and (b) in the context of any such releases, the aggregate holdings of the Supporting Creditors (but, as indicated above, not their identities or their individual holdings),

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

(ii) any Party hereto may disclose the identities of the Parties hereto and their individual holdings in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof, (iii) any Party hereto may disclose, to the extent consented to in writing by a Supporting Creditor, such Supporting Creditor's identity and individual holdings and (iv) to the extent required by the Bankruptcy Code, Bankruptcy Rules, Local Rules of the Bankruptcy Court or other applicable rules, regulations or procedures of the Bankruptcy Court or the Office of the United States Trustee, NRG may disclose the individual identities of the Supporting Creditors in a writing that has first been sent to counsel for the Supporting Noteholders and counsel for the Global Steering Committee for review and comment on five business days' notice.

17. *Preparation of Restructuring Documents.* Notwithstanding anything to the contrary contained in this Agreement, including specifically any obligation of a Party to use efforts to cause an event to occur by the "earliest practical date," the obligations of the Parties hereunder shall be expressly subject to the preparation of definitive documents relating to the transactions contemplated by this Agreement and the Term Sheet, (i) including without limitation, (a) the NRG Plan, the Disclosure Statement, the Confirmation Order, and any related ballots, releases and settlement documents and (b) all other agreements, instruments, orders or other documents necessary or appropriate to consummate the transactions contemplated by this Agreement, the Term Sheet or the NRG Plan, each of which documents must be acceptable to each of the Parties, and (ii) any "first day" orders and motions must be acceptable to each of the Required Parties.

18. *Amendment or Waiver.* Except as otherwise specifically provided herein, this Agreement may not be modified, amended or supplemented without the prior written consent of the Required Parties. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

19. *Notices.* Any notice required or desired to be served, given or delivered under this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by personal delivery, or upon receipt of fax delivery, as follows:

a. if to any member of the NRG Group, to Matthew A. Cantor, Kirkland & Ellis, Citigroup Center, 153 East 53rd Street, New York, New York 10022-4611, fax: 212-446-4900;

b. if to Xcel, to Brad B. Erens, Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692, fax: 312-782-8585, with a copy to Scott J. Friedman, Jones Day, 222 East 41st Street, New York, New York 10017, fax: 212-755-7306:

c. if to the Supporting Noteholders, to Evan D. Flaschen, Bingham McCutchen LLP, One State Street, Hartford, CT 06103, fax: 860-240-2800; and

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

      d. if to the Supporting Lenders, to Peter V. Pantaleo and David J. Mack, Simpson Thacher & Bartlett, 425 Lexington Avenue, New York, New York, 10017-3954, fax: 212-455-2502.

20. *Governing Law; Jurisdiction.* THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York. By execution and delivery of this Agreement, each of the Parties hereto irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum. Notwithstanding the foregoing consent to New York jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

21. *Specific Performance.* This Agreement, including without limitation the Parties' agreement herein to support the NRG Plan and to facilitate its confirmation, is intended as a binding commitment enforceable in accordance with its terms. It is understood and agreed by each of the Parties hereto that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.

22. *Headings.* The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

23. *Interpretation.* This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

24. *Successors and Assigns.* This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives.

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

25. *No Third-Party Beneficiaries.*  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

26. *No Waiver of Participation and Reservation of Rights.*  Except as expressly provided in this Agreement and in any amendment among the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by NRG or any of its affiliates and subsidiaries.  If the transactions contemplated by this Agreement or in the NRG Plan are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

27. *No Admissions.*  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

28. *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile shall be effective as delivery of a manually executed signature page of this Agreement.

29. *Representation by Counsel.*  Each Party acknowledges that it has been represented by counsel with this Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

30. *Entire Agreement.*  This Agreement and the exhibits and schedules hereto, including, without limitation, the Term Sheet, constitute the entire agreement between the Parties and supersedes all prior and contemporaneous agreements, representations, warranties and understandings of the Parties, whether oral, written or implied, as to the subject matter hereof.

31. *Several not Joint.*  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint

32. *Tax Shelter Regulations.*  Notwithstanding anything herein to the contrary, any Party to this Agreement (and any employee, representative, or other agent of any Party to this Agreement) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by the Term Sheet or the NRG Plan and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

such tax treatment and tax structure; provided, however, that no Party (nor any employee, representative or other agent thereof) shall disclose (A) any information that is not relevant to an understanding of the tax treatment of the transactions contemplated by the Term Sheet or the NRG Plan, including the identity of any Party to this Agreement (or its employees, representatives or agents) or other information that could lead any person to determine such identity or (B) any information to the extent such disclosure could result in a violation of any federal or state securities laws.

[Remainder of page intentionally blank; remaining pages are signature pages.]

**IN WITNESS WHEREOF**, the undersigned have each caused this Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first above written.

**NRG ENERGY, INC.,** on behalf of itself and each of its affiliates identified on Schedule 1-A

By: _____
Name:
Title:

**XCEL ENERGY INC.**

By: _____
        Name:
        Title:

**SUPPORTING NOTEHOLDER:**

_____

**NAME**


By: _____
      Name:
      Title:


| **Issuance** | **Issue Amount** | **Maturity** | **Principal Amount Held** |
|---|---|---|---|
| 6.750% Senior Notes | $340 million | July 15, 2006 | $ |
| 7.500% Senior Notes | $250 million | June 15, 2007 | $ |
| 7.500% Senior Notes | $300 million | June 1, 2009 | $ |
| 7.625% Senior Notes | $125 million | February 1, 2006 | $ |
| 7.750% Senior Notes | $350 million | April 1, 2011 | $ |
| 7.970% Senior Notes (ROARS) | $233 million | March 15, 2020 | $ |
| 8.000% Senior Notes (ROARS) | $240 million | November 1, 2013 | $ |
| 8.250% Senior Notes | $350 million | September 15, 2010 | $ |
| 8.625% Senior Notes | $500 million | April 1, 2031 | $ |
| 6.500% Equity Unit Bond | $287.5 million | May 16, 2006 | $ |
| 8.700% Senior Notes (issued in connection with a certain debt and derivative transaction to synthetically issue £160 million debt ) | $250 million | March 15, 2005 | $ |
|  |  | TOTAL HELD: | $ |

**SUPPORTING LENDER:**

_____
**NAME**

By: _____
      Name:
      Title:

| Lender Facility | Amount Outstanding | Principal Amount Held |
|---|---|---|
| NRG Revolver | $1,000,000,000 | |
| L/C Facility | $125,000,000 | |
| Finco Credit Agreement | $1,081,000,000 | |
| | TOTAL HELD: | $ |

[Plan Support Agreement Signature Page for Supporting Lender]

## Schedule 1-A
## (Relevant NRG Subsidiaries)
## Continuing Subsidiaries

| Finance Group | Debtor | State Of Incorporation |
|---|---|---|
| N/A | NRG Energy, Inc. | Delaware |
| N/A | NRG Power Marketing Inc. | Delaware |
| N/A | NRGenerating Holdings No. 23 B.V. | |
| NORTHEAST | Arthur Kill Power LLC | Delaware |
| NORTHEAST | Astoria Gas Turbine Power LLC | Delaware |
| NORTHEAST | Berrians I Gas Turbine Power, LLC | |
| NORTHEAST | Connecticut Jet Power LLC | Delaware |
| NORTHEAST | Devon Power LLC | Delaware |
| NORTHEAST | Dunkirk Power LLC | Delaware |
| NORTHEAST | Huntley Power LLC | Delaware |
| NORTHEAST | Middletown Power LLC | Delaware |
| NORTHEAST | Montville Power LLC | Delaware |
| NORTHEAST | Northeast Generation Holding LLC | Delaware |
| NORTHEAST | Norwalk Power LLC | Delaware |
| NORTHEAST | NRG Eastern LLC | Delaware |
| NORTHEAST | NRG Northeast Generating LLC | Delaware |
| NORTHEAST | Oswego Harbor Power LLC | Delaware |
| NORTHEAST | Somerset Power LLC | Delaware |
| SOUTH CENTRAL | Big Cajun II Unit 4 LLC | Delaware |
| SOUTH CENTRAL | Louisiana Generating LLC | Delaware |
| SOUTH CENTRAL | NRG New Roads Holdings LLC | Delaware |
| SOUTH CENTRAL | NRG South Central Generating LLC | Delaware |
| SOUTH CENTRAL | NRG Central US LLC | |
| SOUTH CENTRAL | South Central Generation Holding LLC | |

## Non-Continuing Subsidiaries

| Finance Group | Debtor | State Of Incorporation |
|---|---|---|
| FINCO | NRG Capital LLC | Delaware |
| FINCO | NRG Finance Company I LLC | Delaware |

# Schedule 2-A
## (Senior Notes)

| Issuance | Issue Amount | Indenture Date | Maturity |
|---|---|---|---|
| 6.750% Senior Notes | $340 million | March 13, 2001; July 16, 2001 | July 15, 2006 |
| 7.500% Senior Notes | $250 million | June 1, 1997 | June 15, 2007 |
| 7.500% Senior Notes | $300 million | May 25, 1999 | June 1, 2009 |
| 7.625% Senior Notes | $125 million | January 21, 1996 | February 1, 2006 |
| 7.750% Senior Notes | $350 million | March 13, 2001; April 5, 2001 | April 1, 2011 |
| 7.970% Senior Notes (ROARS) | $233 million | March 20, 2000 | March 15, 2020 |
| 8.000% Senior Notes (ROARS) | $240 million | November 8, 1999 | November 1, 2013 |
| 8.250% Senior Notes | $350 million | September 11, 2000. | September 15, 2010 |
| 8.625% Senior Notes | $500 million | March 13, 2001; April 5, 2001; July 16, 2001 | April 1, 2031 |
| 6.500% Equity Unit Bond | $287.5 million | March 13, 2001 | May 16, 2006 |
| 8.700% Senior Notes (issued in connection with a certain debt and derivative transaction to synthetically issue £160 million debt ) | $250 million | March 20, 2000 | March 15, 2005 |

## Schedule 2-B
## (Lender Facilities)

| Credit Agreement | Description |
|---|---|
| NRG Revolver | 364-Day Revolving Credit Agreement dated as of March 8, 2002 (as the same may be amended, supplemented or restated from time to time) among NRG Energy, Inc., the financial institutions party thereto, ABN Amro Bank N.V., as administrative agent, Solomon Smith Barney Inc., as syndication agent, Barclays Bank plc as co-syndication agent, and the Royal Bank of Scotland plc and Bayerische Hypo-Und Vereinsbank AG , New York branch, as co-documentation agents. |
| L/C Facility | $125 Million Standby Letter of Credit Facility dated as of November 30, 1999 (as the same may be amended, supplemented or restated from time to time) among NRG Energy, Inc., the lenders party thereto and Australia and New Zealand Banking Group Limited as administrative agent. |
| Finco Credit Agreement | Credit Agreement dated May 8, 2001 (as the same may be amended, supplemented or restated from time to time) among NRG Finance Company I LLC, Credit Suisse First Boston as administrative agent, the lenders party thereto and NRG Audrain Generation LLC, LSP-Nelson Energy, LLC, LSP-Pike Energy, LLC and NRG Turbine LLC, as sub-borrowers. |

**EXHIBIT A**
**(Term Sheet)**

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

**NRG ENERGY INC.**
**TERM SHEET CONCERNING NRG PLAN AND RELATIONSHIP WITH XCEL ENERGY INC.**
**DATED AS OF MAY 13, 2003**

The following (this **"Term Sheet"**) is an outline of (i) the key terms and provisions of a plan or plans of reorganization for NRG Energy Inc. ("**NRG**") and the other NRG Entities (as defined below) and (ii) in connection therewith, the key terms for the resolution, settlement and treatment under such plan or plans of, among other things, (a) the claims and causes of action (as described more fully below) of NRG against Xcel Energy Inc. ("**Xcel**"), (b) Xcel's claims and causes of action (as described more fully below) against NRG and (c) claims and causes of action (as described more fully below) of the Noteholder Group (as defined below) and the Bank Group (as defined below) against Xcel.

This Term Sheet is subject to finalization and execution of a Plan Support Agreement (the **"PSA"**) to which this Term Sheet is intended to be attached as Exhibit A and the completion of the remaining due diligence on the Internal Revenue Code "gross receipts" test referred to in Section VI.B(B). Upon execution of the PSA, this Term Sheet is intended to be binding on the signatories to the PSA in accordance with the terms of the PSA. However, this Term Sheet remains subject to, among a variety of other things, finalizing any incomplete Schedules hereto, resolving any terms that are bracketed or indicated as being "open" or subject to further review, and acceptable definitive documentation of all matters contemplated herein, including any plan of reorganization for NRG, any court-approved Disclosure Statement related thereto and any agreements related to or terms and conditions of such NRG plan. Any vote in favor of any NRG plan, whether or not it includes the terms and conditions set forth herein, is not being solicited by or agreed to by this Term Sheet and is subject to, among a variety of other things, those matters listed above.

**Notwithstanding anything to the contrary in the foregoing, this Term Sheet is being provided as part of settlement discussions and, as a result, shall be treated as such pursuant to Federal Rule of Evidence 408 and all bankruptcy and state law equivalents.**

## I.    THE APPLICABLE ENTITIES

| | |
|---|---|
| The Parties Generally: | Those persons or entities that execute the PSA (the **"Parties"** and individually a **"Party"**). |
| Xcel: | Xcel Energy Inc. ("**Xcel**"). |
| NRG: | NRG Energy, Inc. ("**NRG**"). |
| The Relevant NRG Subsidiaries: | Of the majority-owned direct and indirect subsidiaries of NRG (collectively, the **"NRG Subsidiaries"**), those subsidiaries listed on **Schedule 1-A** to the PSA or who otherwise become part of the Chapter 11 Cases (together with NRG, the **"NRG Entities"**). |
| The Noteholder Group: | The persons identified on **Schedule 1-B** to the PSA (collectively, as comprised from time to time, the **"Noteholder Group"**), being legal or beneficial holders of, or investment managers with respect to, some of the **"Notes"** identified on **Schedule 2-A** to the PSA. The members of the Noteholder Group and all other holders of the Notes from time to time are referred to as the **"Noteholders."** |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| The Bank Group: | The persons identified on **Schedule 1-C** to the PSA (collectively, the "**Bank Group**"; those persons separately identified on Schedule 1-C, as comprised from time to time, the "**Global Steering Committee**"), being legal or beneficial holders of the claims under "**Lender Facilities**" identified on **Schedule 2-B** to the PSA, comprising (i) the NRG revolving credit facility (the "**NRG Revolver**"), (ii) the NRG letter of credit facility (the "**L/C Facility**") and (iii) the Credit Agreement (as amended, modified and supplemented) dated May 8, 2001 among NRG Finance Company I LLC, Credit Suisse First Boston, the lenders party thereto and NRG Audrain Generation LLC, LSP-Nelson Energy, LLC, LSP-Pike Energy, LLC and NRG Turbine LLC, as sub-borrowers (the "**Finco Credit Agreement**"). |

## II.  DEFINED TERMS

| | |
|---|---|
| **A. "Bankruptcy Court":** | The Bankruptcy Court exercising jurisdiction over the Chapter 11 Cases. |
| **B. "Petition Date":** | The date on which an order for relief is entered with respect to a chapter 11 case with NRG as debtor and debtor-in-possession, such case, together with the chapter 11 cases for those subsidiaries listed on **Schedule 1-A** to the PSA and those other NRG Subsidiaries which NRG consolidates with the NRG chapter 11 case, are referred to herein as the "**Chapter 11 Cases.**" |
| **C. "Effective Date":** | The date on which the NRG Plan becomes effective in accordance with its terms, the occurrence of which shall be subject to various conditions to effectiveness pursuant to the NRG Plan as agreed by the Parties.  As of the Effective Date, the Confirmation Order shall be in full force and effect, and shall not have been stayed or modified, but there shall be no requirement that the Confirmation Order be a Final Order for the Effective Date to occur. |
| **D. "Xcel Payment Date":** | The later of (i) 90 days after the date (the "**Confirmation Date**") on which there occurs the entry of the Confirmation Order on the docket of the Bankruptcy Court and (ii) one business day after the Effective Date. |
| **E. "NRG Plan":** | The chapter 11 plan or plans of reorganization with respect to the NRG Entities, such plan or plans, the related disclosure statement(s) and all plan related documents, agreements and orders to be fully consistent with the terms and provisions of this Term Sheet and otherwise acceptable to the Parties. The order of the Bankruptcy Court confirming the NRG Plan is referred to as the "**Confirmation Order.**" |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| **F. "Final Order":** | An order or judgment of the Bankruptcy Court as entered on the docket in the Chapter 11 Cases that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been resolved by the highest court to which the order or judgment was appealed from or from which certiorari was sought. |
| **G. "NRG Released Causes of Action":** | Collectively, all claims or causes of action of any kind or nature (whether known or unknown) which NRG, any of the NRG Subsidiaries or any creditor of NRG, directly or indirectly, has or may have as of the Effective Date against (A) Xcel or any officer, director, employee, affiliate (other than NRG and the NRG Subsidiaries), agent or other party acting on behalf of Xcel or an affiliate of Xcel (other than NRG and the NRG Subsidiaries), in each case in their capacity as such (Xcel and all such persons and entities being collectively referred to as the "**Xcel Released Parties**"), in respect of the Support and Capital Subscription Agreement between Xcel and NRG dated May 29, 2002 (such claims are referred to as the "**Support Agreement Claims**"), (B) the Xcel Released Parties in respect of any other matter relating to NRG or any of the NRG Subsidiaries or any of the claims of any creditor against NRG or any of the NRG Subsidiaries and all liabilities and causes of action related to such claims and (C) any other person or entity (together with the Xcel Released Parties, the "**Released Parties**") to the extent (but only to the extent) that such person or entity is entitled to a claim for indemnification, reimbursement, contribution, subrogation or otherwise against any of the Xcel Released Parties in respect thereof, it being understood that the liability of any such person or entity other than to the extent of its claims against the Xcel Released Parties shall not be released and is expressly preserved (the claims set forth in clauses (B) and (C), as more particularly described in Section IV.A and subject to the exceptions described in Section IV.B, are referred to as "**All Other Claims**"). Notwithstanding the foregoing, the NRG Released Causes of Action shall not include the Separate Bank Claims. In the event any creditor of NRG or any of the NRG Subsidiaries sells, assigns, trades, or otherwise transfers its claim or cause of action against NRG or any of the NRG Subsidiaries to any third party (including an affiliate or subsidiary of such creditor) (a "**Transferee**") at any time, such Transferee shall be deemed a creditor of NRG or the NRG Subsidiaries as applicable and subject to the terms of this Term Sheet. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| **H. "Separate Bank Settlement Group":** | Collectively, those members of the Bank Group as identified on **Schedule II.H** hereto that have Separate Bank Claims and who shall be entitled to the Separate Bank Settlement Payment. |
| **I. "Separate Bank Claims":** | Collectively, all claims or causes of action of any kind or nature, whether known or unknown, which any member of the Separate Bank Settlement Group or a Transferee thereof, directly or indirectly, has or may have against any of the Released Parties related in any manner to or arising in any manner in respect of such Separate Bank Settlement Group member's or Transferee's loans, financings, letter of credit facilities and other financing and support facilities provided to NRG or any of the NRG Subsidiaries, such claims to include, without limitation, claims against the Released Parties of the type described in clauses (2) through (7) and clause (9) of Section IV.A below. |
| **J. "Separate Bank Settlement Payment":** | Pursuant to or in connection with the NRG Plan, $112 million of cash to be funded by Xcel on the Xcel Payment Date to NRG will be concurrently paid by NRG to the Separate Bank Settlement Group on the Xcel Payment Date, but expressly subject to 100% of the members of the Separate Bank Settlement Group prior to that time having executed and delivered to Xcel the Separate Bank Settlement Releases as described in Section V.D. The Separate Bank Settlement Payment shall not be property of NRG's chapter 11 estate. The Separate Bank Settlement Payment is being paid by Xcel solely to facilitate the NRG Plan and the benefits to Xcel thereunder. The Separate Bank Settlement Payment is, expressly, not being paid as any concession of the validity of any claims being released. |
| **K. "Xcel Contribution":** | (1) Collectively, (1) $640 million, subject to the provisions of Sections III.B and III.C. and (2) the Xcel Released Causes of Action. $238 million of the Xcel Contribution shall be paid in cash to NRG on the Xcel Payment Date (the **"Initial Contribution"**). $50 million of the Xcel Contribution shall be paid to NRG on the later of January 1, 2004 and the Xcel Payment Date (the **"Second Installment"**). The Second Installment may be paid by Xcel in Xcel stock pursuant to the Xcel Shares Option (as described in Section III.C). Except as provided in Section III.B with respect to the timing thereof and subject to reduction as set forth in Section V.C, $352 million of the Xcel Contribution shall be paid in cash to NRG on the later of April 30, 2004 and the Xcel Payment Date (the **"Third Installment"**); provided, however, that Xcel shall not be required to pay NRG the positive difference, if any, between the Third Installment and the amount |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

|  |  |
|---|---|
|  | of the Cash Refund (as defined below) received by Xcel as of such date until 30 days after the due date of the Third Installment.<br><br>(2) Although, as indicated in Section III.A(2), the Release-Based Amount is being paid in part to facilitate the NRG Plan and the benefits to Xcel thereunder, the payment of the Third Installment will be required regardless of whether the Cash Refund is ever received or whether any Xcel Tax Benefit is later reduced or eliminated on audit by a taxing authority. The Third Installment shall be payable without interest; *provided*, if Xcel defaults in the timely payment of the Third Installment (taking into account the 30 day grace period set forth above), the unpaid amount shall accrue simple interest at 10% per annum from the date of non-payment until the date of payment (in addition to any other remedies such as collection actions, the reasonable cost of which shall also be payable by Xcel).<br><br>(3) An escrow account will be maintained by a disbursing agent for receipt of any portion of the Xcel Contribution received after the Xcel Payment Date; the disbursing agent shall promptly distribute to the Unsecured Creditor Class (defined below) all funds received in this account, subject to requirements for disbursement of the Release-Based Amount and subject to standard hold-back provisions with respect to Disputed Claims. |
| **L. "Xcel Released Causes of Action":** | Collectively, all claims or causes of action of any kind or nature (whether known or unknown) which Xcel has or may have against any of the NRG Entities or any officer, director, employee, affiliate or agent of any of the NRG Entities, in each case in their capacity as such, except as otherwise provided in this Term Sheet (such exclusion to include, for instance, Xcel's existing and future intercompany claims against the NRG Entities as set forth in Section IX.A hereof). |
| **M. "Continuing Debtor Subsidiaries":** | Those NRG Subsidiaries identified as Continuing Debtor Subsidiaries on **Schedule 1-A** to the PSA. |
| **N. "Noncontinuing Debtor Subsidiaries":** | Those NRG Subsidiaries identified as Noncontinuing Debtor Subsidiaries on **Schedule 1-A** to the PSA. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

### III.   DETAILS OF THE XCEL CONTRIBUTION AND THE SEPARATE BANK SETTLEMENT PAYMENT

| A. Allocation of Xcel Contribution: | (1) $250 million of the Xcel Contribution (the "**Support Agreement Amount**") shall be in exchange for the release of the NRG Released Causes of Action comprised of the Support Agreement Claims. The Support Agreement Amount shall be payable out of the entire Initial Contribution and $12 million of the Second Installment. The Confirmation Order shall expressly provide that the Support Agreement Claims belong solely and exclusively to NRG and not to any creditor of NRG or of any other NRG Entity and that the Support Agreement Claims are fully released as to all entities as of the Effective Date, subject to payment in full of the Support Agreement Amount.<br><br>(2) Up to $390 million of the Xcel Contribution (the "**Release-Based Amount**"), together with the Xcel Released Causes of Action, shall be in exchange for the releases described in Section V.C of the NRG Released Causes of Action comprised of All Other Claims. The Release-Based Amount shall be paid out of $38 million of the Second Installment and the entire Third Installment.<br><br>The Release-Based Amount is being paid by Xcel solely to facilitate the NRG Plan and the benefits to Xcel thereunder. The Release-Based Amount is, expressly, not being paid as any concession of the validity of any claims being released. |
|---|---|
|  |  |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | | |
|---|---|---|
| **B.** Payment of Xcel Contribution in the Event of an Xcel Downgrade | (1) | As of April 1, 2003, Xcel's senior unsecured public notes (the **"Xcel Notes"**) were rated BBB- by Standard & Poor's and Baa3 by Moody's (the **"4/1/03 Ratings"**).  In the event that on the Confirmation Date the Xcel Notes have not retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days through and including the Confirmation Date, then Xcel, in its sole discretion, may, subject to the creditor election described below, pay up to $150 million of the Initial Contribution no later than 10 business days after the Xcel Payment Date in registered, unrestricted and freely-tradable "XEL" common stock (**"XEL Stock"**) that has been registered under the Securities Act of 1933, as amended, pursuant to an effective registration statement (the **"Xcel Downgrade Election"**).  In such event, no later than five business days after the Confirmation Date, Xcel shall issue a press release stating whether Xcel has elected to make any or all of $150 million of the Initial Contribution in XEL Stock and the portion, if any, of such part of the Initial Contribution that will be paid in XEL Stock.  The number of shares of XEL Stock that Xcel shall be required to deliver shall be the nearest whole number of shares equal to (x) the amount of the Initial Contribution made in XEL Stock divided by (y) the average closing price for XEL Stock for the last ten full trading days through and including the business day prior to the date when the portion of the Initial Contribution to be paid in XEL Stock is made. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

(2)    Notwithstanding the foregoing, the "Authorized Party" (as defined below) may request that Xcel not exercise the Xcel Downgrade Election by causing Xcel to receive written notice of such request (an **"NRG Payment Request"**) within five business days after Xcel's issuance of the press release set forth above. After timely receipt by Xcel of an NRG Payment Request, Xcel shall be required to pay NRG the $150 million of the Initial Contribution in cash on the business day after the Xcel Notes have retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days. In addition, through the Effective Date and prior to payment in full by Xcel of the Initial Contribution, the Authorized Party may revoke the NRG Payment Request by causing Xcel to receive written notice of such revocation (an **"NRG Payment Revocation"**). Once given, an NRG Payment Revocation shall be irrevocable. In addition, on the 180th day after receipt by Xcel of an NRG Payment Request, if Xcel shall not have been required to pay NRG the $150 million of the Initial Contribution in cash prior to such date, the NRG Payment Revocation shall be deemed given to Xcel. Upon receipt or deemed receipt by Xcel of an NRG Payment Revocation, Xcel shall pay the portion of the Initial Contribution subject to the Xcel Downgrade Election in Xcel Stock within 10 business days after the later of (i) receipt or deemed receipt of the NRG Payment Revocation and (ii) the Xcel Payment Date. The number of shares of XEL Stock that Xcel shall be required to deliver shall be the nearest whole number of shares equal to (x) the amount of the Initial Contribution made in XEL Stock divided by (y) the average closing price for XEL Stock for the last ten full trading days through and including the business day prior to the date when the portion of the Initial Contribution to be paid in XEL Stock is made.

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

(3) If (i) on the Confirmation Date the Xcel Notes have retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days but (ii) at any time after the Confirmation Date and prior to the Xcel Payment Date the Xcel Notes have not retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days, then the provisions of subsections (1) and (2) above shall apply, but Xcel, in its sole discretion, may, subject to an NRG Payment Request, exercise the Xcel Downgrade Election and pay the requisite XEL Stock no later than the later of (1) 10 business days after the Xcel Payment Date and (2) 105 days after the first date on which the Xcel Notes have not retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days (the **"Downgrade Date"**). In such event, Xcel shall issue a press release stating the specifics of its Xcel Downgrade Election no later than five business days after the Downgrade Date. In addition, in this instance, upon receipt by Xcel of an NRG Payment Revocation, Xcel shall pay the portion of the Initial Contribution subject to the Xcel Downgrade Election in XEL Stock within the later of (i) 10 business days after receipt of the NRG Payment Revocation and (ii) 105 days after the Downgrade Date.

(4) For purposes of this Section III.B, the term **"Authorized Party"** shall mean collectively, the official committee of unsecured creditors of NRG in the Chapter 11 Cases (the **"Creditors' Committee"**) and the Global Steering Committee. The Creditors' Committee or the Global Steering Committee acting without the other shall not be an Authorized Party.

(5) In addition to the foregoing, in the event that on the Xcel Payment Date the Xcel Notes have not retained at least the 4/1/03 Ratings for a period of at least 120 consecutive days through and including the date payment of the Third Installment is due, then the Third Installment shall be extended to the later of June 30, 2004 and sixty days after the Xcel Payment Date.

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| **C.** Xcel Shares Option: | No later than five business days after the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court, Xcel shall issue a press release stating whether Xcel has elected to make any or all of the Second Installment in XEL Stock and the portion, if any, of the Second Installment that will be paid in XEL Stock (the **"Xcel Shares Option"**). To the extent that Xcel chooses the Xcel Shares Option, Xcel shall make such portion of the Second Installment in XEL Stock, pursuant to an effective registration statement.  The number of shares of XEL Stock that Xcel shall be required to deliver shall be the nearest whole number of shares equal to (x) the amount of the Second Installment made in XEL stock divided by (y) the average closing price for XEL Stock for the last ten full trading days through and including the business day prior to the date the Second Installment is due. |
| **D.** Mechanics of Separate Bank Settlement Payment: | The Separate Bank Settlement Payment shall be in exchange for the release of 100% of the Separate Bank Claims and shall be payable entirely in cash.  The Confirmation Order shall expressly provide that when the Separate Bank Settlement Payment is made, the Separate Bank Claims shall be fully released as to all Released Parties as of the Effective Date. |
| **E.** Xcel Released Causes of Action: | The component of the Xcel Contribution comprised of the Xcel Released Causes of Action shall be delivered and effective as of the Effective Date. |

## IV.   NRG RELEASED CAUSES OF ACTION

| | |
|---|---|
| **A.** Included Claims: | The "All Other Claims" component of the NRG Released Causes of Action shall include:<br><br>(1)   any claim that is property of any NRG Entities' estate pursuant to section 541 of the Bankruptcy Code or otherwise;<br><br>(2)   any preference, fraudulent conveyance and other actions under sections 510, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any state law equivalents;<br><br>(3)   any claims arising out of illegal dividends or similar theories of liability;<br><br>(4)   any claims asserting veil piercing, alter ego liability or any similar theory;<br><br>(5)   any claims based upon unjust enrichment;<br><br>(6)   any claims for breach of fiduciary duty; |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

|  |  |
|---|---|
|  | (7) any claims for fraud, misrepresentation or any state or federal securities law violations; |
|  | (8) any claim that NRG or any NRG Subsidiary may have as a result of having been a member of the Xcel affiliated tax group or a signatory to an Xcel tax sharing agreement; and |
|  | (9) except as described in Section IV.B, all other claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities against the Released Parties as of the Effective Date whether or not liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law or in equity. |
| **B.** Excluded Claims: | The "All Other Claims" component of the NRG Released Causes of Action shall <u>not</u> include: |
|  | (1) any obligations relating to Xcel's payment and performance of the Xcel Contribution and the other benefits to be provided by Xcel as described in this Term Sheet; |
|  | (2) any obligations relating to a "transitional services agreement" of the type described in Section VI.E; |
|  | (3) any post-Effective Date obligations relating to the "employee matters agreement" of the type described in Section VI.F; |
|  | (4) any obligations of the Released Parties under the agreements set forth on in **Schedule VI.I**; or |
|  | (5) the Separate Bank Claims. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

## V.  ADDITIONAL ISSUES REGARDING THE XCEL CONTRIBUTION AND THE SEPARATE BANK SETTLEMENT PAYMENT

| | | |
|---|---|---|
| **A.** Classification of Noteholder Group, Bank Group: | (1) | The NRG Plan will classify all allowed impaired unsecured claims against NRG (other than convenience claims) into one *pari passu* class (the **"Unsecured Creditor Class"**). This class will include, without limitation, all unsecured creditors holding funded debt claims against NRG (including the debenture portion of the NRZ Equity Units), all recourse claims against NRG of creditors of the NRG Subsidiaries and other general unsecured claims against NRG such as rejection claims, trade claims, etc. |
| | (2) | All Noteholder claims, all Bank Group claims, including claims under the Lender Facilities, and all Bank project lender recourse claims against NRG (excluding, in each case, postpetition interest, letter of credit fees and other similar postpetition charges not generally allowable under the Bankruptcy Code), will be allowed in full in accordance with the terms of the applicable documents that give rise to such claims, without defense, offset, counterclaim, reduction, subordination or recharacterization. The Parties reserve all rights as to (i) the proper calculation of the amount of any such claims in accordance with the relevant documentation for such claims and (ii) solely in connection therewith, the proper interpretation of all such documents. The Parties will use their commercially reasonable efforts to resolve any issues (if any) concerning such matters either consensually or judicially prior to the commencement of the hearing on the Disclosure Statement for the NRG Plan. |
| **B.** Allocation of Support Agreement Amount: | | The Support Agreement Amount shall be paid to NRG and available pro rata to all allowed claims in the Unsecured Creditor Class (which claims, as to members of the Separate Bank Settlement Group, shall not be reduced by receipt of the Separate Bank Settlement Payment); <u>provided, however</u>, that the NRG Plan shall provide which portion, if any, of the Support Agreement Amount shall be retained by NRG to the extent necessary to provide working capital for its business. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| **C.** Timing and Allocation of Release-Based Amount: | (1) | In addition to the general releases set forth in the NRG Plan as described in Section VI.A, the relevant ballots distributed in connection with the NRG Plan to the creditors of NRG will have an election (the "**Release Election**"), in form and substance satisfactory to Xcel, by which each creditor of NRG can expressly elect to release, in such creditor's capacity both as a creditor of NRG and (if applicable) as a creditor of any NRG Subsidiary, the Released Parties from all NRG Released Causes of Action by checking an appropriate box on such ballot, subject to such creditor's receipt of its pro rata share of the Release-Based Amount. The Released-Based Amount shall be distributable pro rata to all allowed claims in the Unsecured Creditor Class (which claims, as to members of the Separate Bank Settlement Group, shall not be reduced by receipt of the Separate Bank Settlement Payment), provided that creditors not checking the box would not receive their pro rata portion of the Release-Based Amount; instead, the aggregate share of the Release-Based Amount of those who did not check the box which otherwise would have been payable to all such creditors (if they had checked the box) will be credited against and deducted from the Xcel Contribution in inverse order of maturity. |
| | (2) | The Release-Based Amounts so credited or deducted will be based upon the maximum amount for which such claim(s) could be allowed. In the event such claim(s) are allowed by a Final Order in an amount less than the maximum amount, the Release-Based Amount withheld on account of the difference between the maximum amount and allowed amount, to the extent an Xcel Contribution payment has been reduced by such credit or deduction, will be distributed ratably to creditors entitled to the Release-Based Amount. A party with a claim against NRG and an NRG Subsidiary as of the Petition Date and who agrees to eliminate such claim against NRG as result of separate consideration from an NRG Subsidiary shall be deemed to have retained its original claim against NRG solely for purposes of the Released-Based Amount unless such creditor's claim against the NRG Subsidiary is unimpaired or such creditor agrees to release all of its NRG Causes of Action against the Released Parties as part of the elimination of its claim against NRG. In connection with the NRG Plan, NRG, Xcel, the Creditors' Committee, the Global Steering Committee and the Noteholder Group shall enter into an agreement specifying the details as to how to calculate the Released-Based Amount payable by Xcel to NRG at any time based upon, among other things, the creditors who make the Release Election, the creditors who do not make the Release Election, the allowance and/or estimation of claims and other factors (the "**Released-Based Amount Agreement**"). |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | | |
|---|---|---|
| **D.** Timing and Allocation of Separate Bank Settlement Payment: | (1) | Provided that 100% of the Separate Bank Settlement Group members have executed and delivered a Separate Bank Settlement Release to Xcel, the Separate Bank Settlement Payment shall be paid in cash simultaneously with the payment of the Initial Contribution and shall be allocated solely to the Separate Bank Settlement Group. |
| | (2) | In addition to the general releases set forth in the Plan as described in Section VI.A and the Release Election described in Section V.C., release forms (the **"Separate Bank Settlement Releases"**) will be distributed to the members of the Separate Bank Settlement Class.  The Separate Bank Settlement Releases will not call for a vote on the NRG Plan, as the Separate Bank Claims are only against the Released Parties, not the NRG Entities.  The Separate Bank Settlement Releases will be in form and substance satisfactory to Xcel and the Bank Group, will be a condition to the occurrence of the Effective Date and will permit each member of the Separate Bank Settlement Group to expressly elect to release the Released Parties from all Separate Bank Claims by signing and returning the Separate Bank Settlement Release to Xcel.  In exchange for 100% of the members of the Separate Bank Settlement Group signing and returning the Separate Bank Settlement Release, such members would receive their share (as determined by and among the members of the Separate Bank Settlement Group) of the Separate Bank Settlement Payment. |

## VI.  OTHER XCEL-RELATED PLAN AND CONFIRMATION ORDER PROVISIONS

| | |
|---|---|
| **A.** General Release of NRG Released Causes of Action: | The NRG Plan would provide that NRG, each of the NRG Subsidiaries and, to the maximum extent permitted by law, each impaired creditor of the NRG Entities would be deemed to have released the Released Parties as of the Effective Date from all NRG Released Causes of Action, whether or not, in the case of a creditor, such creditor has voted for or against, or has not voted with respect to, the NRG Plan and whether or not such creditor has objected to the NRG Plan or the release of its NRG Released Causes of Action against the Released Parties pursuant to the NRG Plan. |
| **B.** Tax Issues: | (A) For federal income tax purposes, Xcel shall claim a worthless stock deduction for its NRG stock for the year in which the NRG Plan becomes effective (the **"Loss Year"**).  Xcel shall not claim a worthless stock deduction for any year before the Loss Year.  **"Xcel Tax Benefit"** means the reduction in federal income tax liability of Xcel, any affiliate and the Xcel consolidated group, as the case may be, attributable to the worthless stock deduction, including without limitation the amount of any cash |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| | refund of taxes (including any interest paid thereon) to be generated by the carryback of such deduction in whole or in part to any taxable year prior to the Loss Year (the **"Cash Refund"**) and the reduction of any estimated payments of federal income tax liability in the Loss Year or any subsequent year, which reduction may be made (or not made) by Xcel in its sole discretion.<br><br>The NRG Plan and the Confirmation Order would provide that:<br><br>The Xcel Tax Benefit would be the sole and exclusive property of Xcel, and the NRG Entities and any party claiming by or through them would release any right or interest that they might otherwise have in the Xcel Tax Benefit as part of the NRG Plan; and<br><br>NRG and its direct and indirect subsidiaries would not be (a) reconsolidated with Xcel or any of its other affiliates for tax purposes at any time after their June 2002 re-affiliation or (b) treated as a party to or otherwise entitled to the benefits of any tax sharing agreement with Xcel.<br><br>(B)   From the Petition Date through and including the Effective Date, NRG shall neither cause nor permit to be made any distribution from an NRG subsidiary to the extent that (1) the distribution would be treated as a dividend for federal income tax purposes and (2) the distribution or portion thereof so treated, alone or in combination with any other distribution during that period, to the extent so treated, would exceed $x. For purposes of this limitation, "x" shall be based on (and be less than) the excess of NRG's aggregate gross receipts over its aggregate receipts from the passive income sources listed in section 165(g)(3)(B) of the Internal Revenue Code and shall be determined by Xcel and communicated to NRG as quickly as practicable after completion of the remaining due diligence on the "gross receipts" test set forth in that section. |
| | |
| **C.** Injunctions | The Confirmation Order shall:<br><br>(1)     (A) contain a finding that certain NRG Released Causes of Action to be specified by Xcel (including all veil piercing, alter ego and similar claims and Support Agreement Claims) are, to the maximum extent permitted by law, the exclusive property of the NRG Entities, as debtors-in-possession, pursuant to section 541 of the Bankruptcy Code, (B) contain a ruling that all NRG Released Causes of Action and all Separate Bank Claims against the Released Parties are fully settled and released under the NRG Plan, (C) contain a ruling that the Separate Bank Settlement |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

<table>
<tr><td></td><td>Payment is not property of NRG's chapter 11 estate and (D) permanently enjoin any creditor of any of the NRG Entities from pursuing any NRG Released Causes of Action or any Separate Bank Claims against any of the Released Parties; and</td></tr>
<tr><td></td><td>(2) permanently enjoin any person or entity that holds, has held or may hold a claim or cause of action released under the NRG Plan from taking any of the following actions on account of any NRG Released Causes of Action or the Separate Bank Claims: (A) commencing or continuing in any manner any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance, (D) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released person or entity; and (E) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the NRG Plan.</td></tr>
<tr><td></td><td>(3) Notwithstanding anything herein to the contrary, if 100% of the members of the Separate Bank Settlement Group do not sign the Separate Bank Settlement Release or the Separate Bank Settlement Payment is not made in accordance with the terms herein, the Separate Bank Claims shall not be released, discharged or otherwise impaired in any way by the NRG Plan, the Confirmation Order or any other order in the Chapter 11 Cases.</td></tr>
<tr><td>**D. Certain Obligations and Arrangements:**</td><td>On the Effective Date, all Xcel guarantees, equity contribution obligations, indemnification obligations, arrangements whereby Xcel has posted cash collateral and all other credit support obligations with respect to NRG or any NRG Subsidiary, in each case set forth on **Schedule VI.D** hereto or such additional items added to Schedule VI.D. by Xcel by the NRG bar date not to exceed in the aggregate $5 million of face amount for such added items (collectively, the **"Guarantees"**), shall be terminated (with Xcel having no further liability for such obligations or arrangements) and all such cash collateral shall be returned to Xcel on the Effective Date, except that NRG shall cooperate with Xcel and support the return to Xcel of the $11.5 million of cash collateral posted by Xcel for the Mid-Atlantic project at the earliest practical date after the current expiration of the relevant Mid-Atlantic agreement in July of 2003. NRG and the NRG Subsidiaries shall be solely responsible for renewing, administering and paying for their own insurance policies starting with insurance policies relating to property and other coverages</td></tr>
</table>

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | |
|---|---|
| | expiring as of June, 2003, and insurance policies covering director and officer liabilities (the **"D&O Policy"**) expiring on August 18, 2003 (the **"D&O Expiration Date"**); provided, however, that Xcel shall (1) not cancel the D&O Policy before the D&O Expiration Date, (2) reasonably cooperate with NRG's past or current officers and directors who may be entitled to coverage under the D&O Policy to allow them to administer their claims and (3) if available and at the sole cost of NRG, and after receiving sufficient funds from NRG, at NRG's request purchase customary tail coverage for NRG's officers and non-Xcel directors in office on the day prior to the Petition Date and who are entitled to coverage under the D&O Policy. |
| **E. Transitional Services Agreement:** | The NRG Plan would, if desired by NRG, incorporate a transitional services agreement pursuant to which Xcel would provide NRG specified administrative services for a specified reasonable agreed period after the Effective Date, as requested by NRG, and would receive compensation therefor at the cost to Xcel of goods provided or the fair value of services provided. |
| **F. Employee Matters Agreement:** | The NRG Plan would approve an employee matters agreement pursuant to which various obligations with respect to employees and benefit plans would be allocated between Xcel and NRG as set forth in **Schedule VI.F** hereto as of the Effective Date. |
| **G. Tax Matters Agreement and Control Group Indemnity:** | Effective as of the Effective Date, Xcel and NRG shall enter into a tax matters agreement that addresses liability for any unpaid taxes of NRG and Xcel for periods during which NRG and Xcel were part of the same consolidated, combined or unitary tax group, entitlement to any tax refunds for such periods, the control of contests for such periods, cooperation with respect to audits and such other matters as would be customary in a tax matters agreement between similarly-situated corporations. In addition, Xcel and NRG shall use their commercially reasonable efforts to negotiate and execute on the Effective Date an agreement satisfactory to the Parties whereby Xcel and NRG (on behalf of itself and the NRG Subsidiaries) shall separately indemnify each other on and as of the Effective Date for any actions taken by the indemnifying party through the Effective Date where the statutory liability imposed on the indemnified party is solely by reason of Xcel's direct or indirect ownership of NRG and the NRG Subsidiaries. |
| **H. NRZ Equity Units:** | The Confirmation Order shall provide that the right and obligation of any holder of an NRZ Equity Unit to purchase common shares of Xcel was terminated as of the Petition Date. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| I. Other Xcel Agreements: | The NRG Plan would provide for assumption by NRG of the agreements with Xcel described on **Schedule VI.I** hereto. Agreements not on Schedule VI.I would be rejected. |
|---|---|

## VII.  OVERALL NRG PLAN CLASSIFICATION AND TREATMENT OF CLAIMS

| CLASS | TYPE OF CLAIM/INTEREST | TREATMENT | VOTING RIGHTS |
|---|---|---|---|
| Class 1 | Unsecured Priority Claims | *Unimpaired.* Each holder of a Class 1 Claim will receive cash in an amount equal to the allowed amount of their claim. | Not entitled to vote. Deemed to accept. |
| Class 2 | Convenience Claims | *Unimpaired.* Each holder of an allowed claim in Class 2 will receive cash equal to the amount of such Claim against such Debtor (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section 3.4 of the NRG Plan). | Not entitled to vote. Deemed to accept. |
| **Class 3** | Secured Claims against Noncontinuing Debtor Subsidiaries | *Impaired.* **[At the Debtors' option]**, the Debtors shall distribute to each holder of a secured claim classified in Class 3 (a) the collateral securing such allowed secured Claim, (b) cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any collateral securing such allowed secured claim, less the actual costs and expenses of disposing of such collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of such allowed secured claim, on the later of (i) the Effective Date and (ii) the fifteenth business day of the first month following the month in which such claim becomes an allowed secured claim, or as soon after such dates as is practicable. Each holder of an allowed claim in Class 3 shall retain the liens securing such claim as of the confirmation date until the Debtors shall have made the distribution to such holder provided for in Article IV of the NRG Plan. | Entitled to vote |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| CLASS | TYPE OF CLAIM/INTEREST | TREATMENT | VOTING RIGHTS |
|---|---|---|---|
| Class 4 | *Intentionally Omitted* | | |
| Class 5 | Miscellaneous Secured Claims | *Impaired.* **[At the Debtors' option,]** the Debtors shall distribute to each holder of an allowed miscellaneous secured claim (a) the collateral securing such allowed secured claim, (b) cash in an amount equal to the proceeds actually realized from the sale, pursuant to section 363(b) of the Bankruptcy Code, of any collateral securing such allowed secured claim, less the actual costs and expenses of disposing of such collateral, or (c) such other treatment as may be agreed upon by the Debtors and the holder of an allowed miscellaneous secured claim, on the later of (i) the Effective Date and (ii) the fifteenth business day of the first month following the month in which such claim becomes an allowed secured claim, or as soon after such dates as is practicable. Each holder of an allowed claim in Class 5 shall retain the Liens securing such claim as of the confirmation date until the Debtors shall have made the distribution to such holder provided for in Article IV of the NRG Plan. | Entitled to vote |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| CLASS | TYPE OF CLAIM/INTEREST | TREATMENT | VOTING RIGHTS |
|-------|------------------------|-----------|---------------|
| Class 6 | NRG Unsecured Claims, including NRG Rejected Guaranty Claims | *Impaired.* Except as otherwise provided in the NRG Plan with respect to certain letter of credit claims, each holder of an allowed claim in Class 6 will receive its pro rata share of (a) on the Effective Date, the New NRG Notes, (b) on the Effective Date, 100,000,000 shares of New NRG Common Stock, subject to dilution by the Management Incentive Plan as set forth in Section IX.J of this Term Sheet, and (c) on the date of the Third Installment (or as soon thereafter as practical), cash in an amount not less than the Release-Based Amount; and *provided further that* the Cash distributable to holders of allowed claims in Class 6 represents a pro rata share of the Released-Based Amount, as set forth and described in Section III.A of this Term Sheet and each holder of an Allowed Claim classified in Class 6 shall receive its pro rata share of such cash only if such holder elects (by checking the appropriate box on its Ballot) to grant the releases described in Section III.A of this Term Sheet. | Entitled to vote |
| Class 7 | PMI Unsecured Claims | *Impaired.* On the Effective Date, each holder of an allowed Class 7 claim will receive its pro rata share of New NRG Notes and shares of New NRG Common Stock allocated to Class 7 from Class 6. | Entitled to vote |
| Class 8 | Unsecured Noncontinuing Debtor Subsidiary Claims | *Impaired.* Each holder of an allowed Class 8 claim shall receive no distribution under the NRG Plan on account of such Class 8 Claims. | Not entitled to vote. Deemed to reject. |
| Class 9 | NRG Intercompany Claims | To be discussed. | To be discussed. |
| Class 10 | *Intentionally Omitted* | | |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| CLASS | TYPE OF CLAIM/INTEREST | TREATMENT | VOTING RIGHTS |
|---|---|---|---|
| Class 11 | NRG Old Common Stock | *Impaired.* No property will be distributed to or retained by the holders of allowed equity Interests in Class 11. On the Effective Date, each and every equity interest in Class 11 shall be cancelled and discharged and the holders of Class 11 equity interests shall receive no distribution under the NRG Plan on account of such equity interests. | Not entitled to vote. Deemed to reject. |
| Class 12 | PMI Common Stock | *Unimpaired.* NRG shall retain its 100% ownership interest in PMI. | Not entitled to vote. Deemed to accept. |
| Class 13 | Securities Litigation Claims | *Impaired.* Each and every claim in Class 13 shall be cancelled and discharged and the holders of Class 13 claims shall receive no distribution under the NRG Plan on account of such claims. | Not entitled to vote. Deemed to reject. |
| Class 14 | Noncontinuing Debtor Subsidiary Common Stock | *Impaired.* Each and every equity interest in Class 14 shall be cancelled and discharged and the holders of Class 14 equity interests shall receive no distribution under the NRG Plan on account of such equity interests. | Not entitled to vote. Deemed to reject. |

## VIII. DETAILS OF CLASS 6 DISTRIBUTIONS

| | |
|---|---|
| A. The "New NRG Notes": | The New NRG Senior Notes shall (i) be in an initial principal amount of $500,000,000.00; (ii) at the option of reorganized NRG either (a) accrue interest commencing on the Effective Date payable semiannually in cash at a rate of 10% per annum, or (b) accrue interest at a rate of 12% per annum payable in kind; *provided, however,* that any interest paid in kind shall be paid in cash upon the earlier of the fifth anniversary of the Effective Date or the maturity date of the New NRG Notes; and (iii) mature on the seventh anniversary of the Effective Date. The New NRG Notes will be issued under a new indenture in a form contained in the NRG Plan supplement. |
| B. The "New NRG Common Stock": | (1)    The New NRG Common Stock would be registered under the Securities Act of 1933, as amended, pursuant to an effective registration statement or, if applicable, pursuant to Bankruptcy Code §1145, and NRG would use its best efforts to obtain NASDAQ listing. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | | |
|---|---|---|
| | (2) | Registration Rights Agreement for a percentage of New NRG Common Stock to be agreed upon by the Parties and subject to customary blackout periods. |
| | | |
| C. The "NRG Cash Amount": | **[Formula [Open] for determining amount of NRG cash (i.e., not including any Xcel Contribution) to be distributed to Class 6, including relationship to Exit Financing]** | |

## IX.   MISCELLANEOUS

| | | |
|---|---|---|
| A. Intercompany Claims: | (1) | As part of the settlement with Xcel, any pre- or postpetition claims of Xcel against any of the NRG Entities arising from the provision of intercompany goods or services to any of the NRG Subsidiaries or from payment by Xcel under any Guaranty shall paid in full in cash by NRG in the ordinary course (including payment during the Chapter 11 Cases) in the appropriate amount based on the underlying contracts or agreements between the parties (including all agreements listed on Schedule VI.I), without any subordination or recharacterization of such claims, except that the claims which are to be paid in full in the ordinary course  during the Chapter 11 Cases shall not include claims of Xcel arising under the Guarantees listed in Schedule VI.D but shall include any claims of Xcel related to RDF, Thermal and NSP-Minnesota. Notwithstanding the foregoing, (A) all claims arising or accruing on or prior to January 31, 2003 for the provision of intercompany goods or services under the Xcel/NRG administrative Services Agreement dated June, 2002 (the **"ASA"**) and all claims for amounts paid by Xcel on or prior to January 31, 2003 under any Guaranty (collectively, the **"Settled Claims"**) shall not be paid until the Effective Date, at which time Xcel shall receive, on account of and in full and final settlement of such claims, an unsecured, 2.5 year non amortizing promissory note of NRG in the principal amount of $10 million bearing interest at the per annum rate of 3%; and (B) after January 31, 2003 NRG shall only be responsible for amounts billed under the ASA related to corporate insurance obtained for the benefit of NRG and other services requested by NRG (collectively, the **"Reimbursable Claims"**).  A comprehensive schedule of the types of all existing intercompany claims is set forth on Schedule IX.A hereto.  NRG agrees that it shall not order services from Xcel under the ASA or otherwise inconsistent with the provisions of this Term Sheet. |
| | (2) | NRG shall not take any action, or fail to take any action, which would increase the likelihood that Xcel will be required to make any payment on any Guaranty during the Chapter 11 Cases. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

|  | (3) To the extent, if any, that intercompany claims of Xcel (other than Settled Claims and other than claims under the ASA which are not Reimbursable Claims, but including claims for reimbursement of payments made by Xcel under Guarantees) are unpaid as of the Effective Date, such amounts shall be paid in full in cash on the Effective Date by the relevant NRG Entity under the NRG Plan without any subordination or recharacterization of such claims.<br><br>(4) The provisions of this Section IX.A shall not apply to any tax sharing agreement. All tax sharing agreements, to the extent otherwise binding on Xcel and NRG, shall terminate (without any residual or ongoing liability of either party to the other) as of the Effective Date for all taxable periods, past, present and future. On and after the Effective Date, tax matters shall be governed exclusively by the tax matters agreement referred to in Section VI.G above.<br><br>(5) A schedule of the types of existing intercompany claims is set forth on **Schedule IX.A** hereto. Except as provided in the foregoing paragraphs in this Section IX.A, no intercompany claims between NRG and Xcel shall be paid. |
|---|---|
| **B.** Solicitation; Fiduciary Duties: | As discussed in the introductory language to this Term Sheet and in the PSA, notwithstanding anything herein to the contrary, each Party expressly acknowledges and agrees that the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, the fiduciary duties of the NRG Entities as debtors in possession, the fiduciary duties of any Noteholder or member of the Bank Group that is appointed to the Creditors' Committee or the role of any state or federal agencies with regulatory authority concerning Xcel or any of the NRG Entities. |
| **C.** Board of Directors and Management: | (A) Xcel has informed the Parties that the NRG Board of Directors immediately after the time of the order for relief in the Chapter 11 Cases shall be:<br><br>(1) Scott Davido, who shall also be Chairman of the Board;<br><br>(2) Ershel C. Redd, Jr.; and<br><br>(3) Leonard LoBiondo, who shall also be CRO of NRG. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

|  |  |
|---|---|
|  | (B)  The Board of Directors of reorganized NRG will be staggered and will consist of: |
|  | (1)     six directors designated by the Noteholder Group; |
|  | (2)     four directors designated by the members of the Bank Group; and |
|  | (3)     the post-reorganization CEO. |
|  | In addition, there will be a committee consisting of two designees of the Noteholder Group and two designees of the Global Steering Committee. Such committee, by majority vote, shall be satisfied as of the Effective Date with the persons designated to serve as Chief Executive Officer and Chief Financial Officer of reorganized NRG, as well as the employment terms for such persons. |
| **D.** Charter/Bylaws: | Other governance matters (e.g., charter and bylaws) of reorganized NRG to be discussed in good faith. |
| **E.** Other Releases: | In addition to the releases described in Sections V.C, and VI.A above, the NRG Plan shall contain customary releases for directors, officers, pre and post petition committees, professionals, Xcel, NRG, etc. |
| **F.** Other Injunctions: | In addition to the injunctions described in Section VI.C above, the NRG Plan shall contain other customary Chapter 11 injunctions. |
| **G.** Indemnification: | The NRG Plan shall contain customary indemnification provisions for directors, officers, pre and post petition committees, professionals, Xcel, NRG, etc. |
| **H.** Dutch Auction Provisions: | The NRG Plan will incorporate voluntary debt/equity reallocation procedures as more fully described in the NRG Plan. |
| **I.** Settlements with Holders of Project-Level Secured Debt and Funding of Finco Projects: | NRG and the applicable debtor intend to seek from project-level secured lenders, on a project-by-project basis, a consensual restructuring or discharge of such debt.  NRG is continuing to evaluate what additional modifications, if any, are appropriate.<br><br>In the interim, during the pendency of the Chapter 11 Cases, NRG shall fund the "NRG Finco" projects pursuant to the NRG subsidiary term sheet attached as **Schedule IX.I** hereto. |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| **J.** Management Incentive Plan: | The NRG Plan will include a management incentive plan to be determined. |
|---|---|
| **K.** Disputed Claims: | (1) Customary NRG interest-bearing reserve pending resolution of Disputed Claims; and<br><br>(2) An interest-bearing reserve for Xcel's Release-Based Amount for Disputed Claims as described in Section V.C above. |

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Schedule II.H

## SEPARATE BANK SETTLEMENT GROUP[1]

The banks and other financial institutions from time to time parties to (a) the $1,000,000,000 364-Day Revolving Credit Agreement, dated as of March 8, 2002, between NRG Energy, Inc., as Borrower, and ABN AMRO Bank N.V., as Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified; (b) the $2,000,000,000 Credit Agreement, dated as of May 8, 2002, between NRG Finance Company I LLC, as Borrower, and Credit Suisse First Boston, as Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified; and (c) the $125,000,000 Standby Letter of Credit, dated as of November, 1999, between NRG Energy, Inc., as Borrower, and Australia and New Zealand Banking Group Limited, as Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified.

---

[1]     Allocation and mechanics (including concerning a reserve for undrawn ANZ Letters of Credit) as agreed to between the agents.

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

## Schedule VI.D

### (Certain Obligations and Arrangements Between Xcel and NRG)

## Guarantees

| Counterparty | Physical/ Financial | Commodity | Amount of Guaranty | Date Guaranty Expires or Expired (NOTE "A") |
|---|---|---|---|---|
| AEP Energy Services, Inc. | FINANCIAL | ALL | | |
| American Electric Power Service Corp | FINANCIAL | ALL | $ 7,000,000 | 12/31/2002 |
| American Electric Power Service Corp | PHYSICAL | ELECTRIC | | |
| Aquila Merchant Services, Inc. | FINANCIAL | ALL | | |
| Aquila Merchant Services, Inc. | PHYSICAL | ELECTRIC | $ 10,000,000 | 10/12/2002 |
| Aquila Merchant Services, Inc. | PHYSICAL | NAT GAS | | |
| Bank of America, N.A. | FINANCIAL | ALL | $ 10,000,000 | 8/31/2003 |
| Consolidated Edison Energy, Inc. | PHYSICAL | ELECTRIC | $ 10,000,000 | 12/31/2003 |
| Constellation Power Source, Inc. | FINANCIAL | ALL | $ 15,000,000 | 7/31/2003 |
| Constellation Power Source, Inc. | PHYSICAL | ELECTRIC | | |
| Duke Energy Trading & Marketing LLC | FINANCIAL | ALL | | |
| Duke Energy Trading & Marketing LLC | PHYSICAL | ELECTRIC | $ 15,000,000 | 5/24/2003 |
| Duke Energy Trading & Marketing LLC | PHYSICAL | NAT GAS | | |
| El Paso Merchant Energy, L.P. | FINANCIAL | ALL | | |
| El Paso Merchant Energy, L.P. | PHYSICAL | ELECTRIC | $ 12,000,000 | 2/28/2002 |
| El Paso Merchant Energy, L.P. | PHYSICAL | NAT GAS | | |
| Entergy-Koch Trading, LP | FINANCIAL | ALL | | |
| Entergy-Koch Trading, LP | PHYSICAL | ELECTRIC | $ 8,500,000 | 3/31/2003 |
| Entergy-Koch Trading, LP | PHYSICAL | NAT GAS | | |
| Exelon Generation Company, LLC | FINANCIAL | ALL | $ 7,000,000 | 3/31/2003 |
| Exelon Generation Company, LLC | PHYSICAL | ELECTRIC | | |
| HQ Energy Services (U.S.) Inc. | (tolling agmt) | (tolling agmt) | Terminated, Effective 11/30/02 | (n/a) |
| J. Aron & Company | FINANCIAL | ALL | $ 10,000,000 | 1/31/2004 |
| Morgan Stanley Capital Group Inc. | FINANCIAL | ALL | $ 15,000,000 | 9/30/2003 |
| Morgan Stanley Capital Group Inc. | PHYSICAL | ELECTRIC | | |
| PG&E Energy Trading - Gas Corporation | FINANCIAL | ALL | $ 2,000,000 | 12/31/2002 |
| PG&E Energy Trading - Gas Corporation | PHYSICAL | NAT GAS | | |
| PG&E Energy Trading - Power, L.P. | FINANCIAL | ALL | $ 9,000,000 | 12/31/2002 |
| PG&E Energy Trading - Power, L.P. | PHYSICAL | ELECTRIC | | |
| PJM Interconnection, LLC | FINANCIAL | ALL | $ 17,000,000 | $12M 4/30/03, $5M 7/31/03 |
| PJM Interconnection, LLC | PHYSICAL | ELECTRIC | | |
| Select Energy, Inc. | FINANCIAL | ALL | $ 3,000,000 | 8/31/2002 |
| Select Energy, Inc. | PHYSICAL | ELECTRIC | | |
| Sprague Energy Corp. | FINANCIAL | ALL | $ 4,000,000 | 11/30/2003 |
| Sprague Energy Corp. | PHYSICAL | NAT GAS | | |
| Williams Energy Marketing & Trading | FINANCIAL | ALL | Terminated, Effective 11/15/02 | (n/a) |
| Williams Energy Marketing & Trading | PHYSICAL | ELECTRIC | | |
| Atlantic City Electric Company, dba Conectiv (BGS Auction) | FINANCIAL | ALL | $ 11,500,000 | 7/31/2003 |
| NEPOOL | PHYSICAL | ELECTRIC | $ 60,000,000 | 12/31/2003 |
| Obligation total, for the counterparties from above | | | $ 226,000,000 | |
| Obligation total above covered under Xcel guaranties or assignments | | | $ 226,000,000 | |

NOTE "A":
Any transactions that were entered into with a CP on or before the expiration date of the guaranty will be covered through the duration of the trade(s) on an "evergreen" basis. Thus, for Aquila, El Paso, and PGET Power, all trade obligations of NRG were entered into prior to the expiration dates of those guaranties, even though the periods ultimately covered under those trade obligations are relatively far out into the future (to 12/03 for Aquila and PGET Power, to 12/06 for El Paso). The inclusion of a guaranty or other item on this Schedule VI.D which has expired shall not be deemed a statement that such guaranty or other item is otherwise effective or in force or effect.

**PROVIDED AS PART OF SETTLEMENT DISCUSSIONS; SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND ALL BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Bonds

| Bond Number | Principal | Amount | Description | Obligee | Eff Date | Exp Date | Premium | Surety | Div. | Indemnity |
|---|---|---|---|---|---|---|---|---|---|---|
| **INDEMNIFIED BY XCEL ENERGY:** | | | | | | | | | | |
| **ST. PAUL BONDS** | | | | | | | | | | |
| 400SD3190 | NRG Processing Solutions LLC | $20,000.00 | License Bond | Hennepin County | 6/30/2002 | 6/30/2003 | $200.00 | St. Paul | NRG | Yes |
| 400SF4076 | NRG Energy Center Pittsburgh | $75,000.00 | Street Opening Bond | City of Pittsburgh | 5/15/2002 | 5/15/2003 | $300.00 | St. Paul | NRG | Yes |
| 400SH7762 | Meriden Gas Turbines, LLC | $876,800.00 | Subdivision Bond | City of Meriden | 8/24/2001 | 8/24/2003 | $1,754.00 | St. Paul | NRG | Yes |
| 400SH7763 | Meridan Gas Turbines, LLC | $768,490.00 | Subdivision Bond | City of Meriden | 8/24/2001 | 8/24/2003 | $1,537.00 | St. Paul | NRG | Yes |
| Sub-Total St. Paul | | $1,740,290.00 | | | | | $3,791.00 | | | |
| **SAFECO BONDS** | | | | | | | | | | |
| 6161831 | Xcel Energy, Inc. | $20,000.00 | Solid Waste Facility Bond | County of Hennepin | 8/9/2002 | 8/9/2003 | $200.00 | Safeco | NRG | Yes |
| Sub-Total Safeco | | $20,000.00 | | | | | $200.00 | | | |
| **CNA BONDS** | | | | | | | | | | |
| 929214989 | NRG Energy Center | $100,000.00 | Highway Occupancy Permit Obligation Bond | PA Dept. of Trans. | 9/21/2002 | 9/21/2003 | $450.00 | CNA | NRG | Yes |
| 929215308 | NRG Power Marketing, Inc. | $250,000.00 | License Bond | Pennsylvania Public Utility Commission | 9/12/2002 | 9/12/2003 | $2,250.00 | CNA | NRG | Yes |
| 929215309 | NRG Energy Center San Diego LLC | $5,000.00 | Franchise Bond | County of San Diego | 9/2/2002 | 9/2/2003 | $100.00 | CNA | NRG | Yes |
| 929222788 | NRG Processing Solutions LLC | $100,000.00 | Tree & Yard Waste Permit Bond | Scott County | 10/12/2002 | 10/12/2003 | $560.00 | CNA | NRG | Yes |
| 929222789 | NRG Processing Solutions LLC | $45,000.00 | Yard Waste Composting & Processing Facility Permit Bond | Dakota County | 10/10/2002 | 10/10/2003 | $252.00 | CNA | NRG | Yes |
| 929222790 | NRG Processsing Solutions LLC | $72,400.00 | Solid Waste Facility Permit Bond | Dakota County | 10/10/2002 | 10/10/2003 | $405.00 | CNA | NRG | Yes |
| 929222795 | NRG Power Marketing, Inc. | $1,000,000.00 | Bond of Distributor of Automotive Fuel | State of New York | 10/12/2002 | 10/12/2003 | $2,250.00 | CNA | NRG | Yes |
| 929222796 | NRG Power Marketing Inc. | $1,000,000.00 | Motor Fuels Tax Bond | State of New Jersey | 10/12/2002 | 10/12/2003 | $2,250.00 | CNA | NRG | Yes |
| 929224970 | NRG Processing Solutions LLC | $100,000.00 | Waste Facility License & Permit Bond | County of Anoka | 11/17/2002 | 11/17/2003 | $560.00 | CNA | NRG | Yes |
| 929224971 | NRG Processing Solutions LLC | $25,000.00 | Waste Facility License/Permit Bond | County of Anoka | 11/17/2002 | 11/17/2003 | $140.00 | CNA | NRG | Yes |
| 929224973 | El Segundo Power LLC | $10,000.00 | Lease Bond | State of California | 11/9/2002 | 11/9/2003 | $100.00 | CNA | NRG | Yes |
| 929224975 | MM SKB Energy LLC | $19,215.00 | Processing Facility Bond | Commonwealth of PA | 11/25/2002 | 11/25/2003 | $108.00 | CNA | NRG | Yes |
| 929224986 | Dunkirk Power LLC | $25,000.00 | Bond of Distributor of Automotive Fuel | State of New York | 1/1/2003 | 1/1/2004 | $100.00 | CNA | NRG | Yes |
| 929224987 | Huntley Power LLC | $35,000.00 | Bond of Distributor of Automotive Fuel | Sate of New York | 1/2/2003 | 1/3/2004 | $100.00 | CNA | NRG | Yes |
| 929225083 | NRG Northeast Affiliate Services, Inc. | $29,000.00 | Workers' Compensation Bond | State of New York | 12/31/2002 | 12/31/2003 | $351.00 | CNA | NRG | Yes |
| 929231861 | NRG Ilion LP LLC | $52,308.00 | Utility Payment Bond | Niagra Mohawk Power Corp. | 12/12/2002 | 12/12/2003 | $471.00 | CNA | NRG | Yes |
| 929239784 | NRG Energy Center Pittsburgh LLC | $80,000.00 | Highway Restoration & Maintenance Bond | Commonwealth of PA | 6/18/2002 | 6/18/2003 | $160.00 | CNA | NRG | Yes |
| 929239794 | Dunkirk Power, LLC | $53,000.00 | Mined Land Reclamation Bond | State of New York | 5/15/2002 | 5/15/2003 | $106.00 | CNA | NRG | Yes |

PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 929239797 | Cabrillo Power LLC | $100,000.00 | Lease Bond | State of California | 5/21/2002 | 5/21/2003 | $175.00 | CNA | NRG | Yes |
| 929239799 | NRG Energy | $1,500,000.00 | Permit Bond | City of St. Paul, MN | 5/23/2002 | 5/23/2003 | $2,625.00 | CNA | NRG | Yes |
| 929242598 | Arthur Kill Power LLC | $10,000.00 | Performance Bond | Department of Energy Conservation | 3/18/2002 | 3/18/2003 | $50.00 | CNA | NRG | Yes |
| Sub-Total CAN | | $4,610,923.00 | | | | | 13,563.00 | | | |
| TOTAL INDEMNIFIED BY XCEL ENERGY | | $6,371,213.00 | | | | | $17,554.00 | | | |
| NON-INDEMNIFIED BONDS | | | | | | | | | | |
| U668424 | NRG Energy, Inc. | $30,000.00 | Solid Waste Management Bond | County of Washington | 1/20/1999 | 1/20/2004 | $400.00 | Reliance | NRG | No |
| Total All NRG Bonds | | $6,401,213.00 | | | | | $17,954.00 | | | |

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Other Indemnification Obligations

Agreement and Consent for Transfer to NRG between Northern States Power Company, NRG Energy, Inc., Anoka County, Hennepin County, Sherburne County, and Tri-County Solid Waste Management Committee dated on or about August 20, 2001.

Affirmation Agreement between Northern States Power Company and NRG Energy, Inc. dated August 8, 1993.

## Other Guaranty Obligations

Guarantees of employment agreements for three NRG employees.

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Schedule VI.F
(Employee Benefit Matters)

### Qualified Defined Benefit Pension Plans

- Xcel would continue to maintain the NRG benefit formulas for NRG employees as part of the Xcel/NRG plan (the "Merged Plan") until the Effective Date.

- On the Effective Date, (a) NRG employees would stop participating in the Merged Plan, (b) all NRG employee Merged Plan benefits would be frozen (except as set forth below) and (c) the obligation for all such benefits would remain in the Merged Plan and would be the responsibility of the Merged Plan and Xcel to fund and provide. To the extent a partial termination, within the meaning of Section 411(d)(3) of the Internal Revenue Code, of the Merged Plan would occur as of the Effective Date, either as a result of the NRG employees ceasing to be employed by Xcel and its subsidiaries or otherwise, such employees would be fully vested as of the Effective Date in their frozen benefits under the Merged Plan as and to the extent provided by Section 411(d)(3) of the Internal Revenue Code. On and after the Effective Date, the Merged Plan would provide that, as of the Effective Date, with respect to NRG employees who are employed by NRG and are participants in the Merged Plan on the Effective Date, credit for employment with NRG on or after the Effective Date would be credited (i) for vesting purposes under the Merged Plan, if no such partial termination occurred, and (ii) for purposes of eligibility for entitlement for the commencement or receipt of benefits under the Merged Plan (including, without limitation, for eligibility for commencement or receipt of any early retirement benefit or supplement), but (iii) for no other purposes including, without limitation, benefit accrual purposes. As hereby modified, such benefits to which NRG employees are entitled under the terms of the Merged Plan would be paid to them by the Merged Plan as and when provided therein.

### Non-Qualified Retirement Plans ("NQRPs")

- Xcel and NRG would determine prior to the Effective Date what proportion of the obligations owing to current NRG employees under the NRG NQRPs is legally allocable to Xcel by virtue of prior service by those employees as Xcel (NSP) employees (the "Xcel NQRP Amount").

- Xcel would maintain responsibility for the Xcel NQRP Amount to the extent it has not already satisfied its obligation therefor. The difference between the total amount owing to current NRG employees under the NQRPs and the Xcel NQRP Amount (the "NRG NQRP Amount") would be reinstated or replaced with a similar nonqualified plan approved by the NRG Plan. Any new plan in respect of the NRG NQRP Amount would be developed in consultation with the Bank Group and the Noteholder Group.

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Schedule VI.I

(Xcel/NRG Agreements To Be Assumed)

1.  Agreement for the Use and Operation of Certain Facilities Located at the High Bridge Plant dated Jan. 23, 2002.

2.  Agreement for the Sale of Thermal Energy and Wood Byproduct between Northern States Power Company and NRG Thermal f/k/a Norenco Corporation, dated November 16, 1989.

3.  Refuse Derived Fuel Supply Agreement between Northern States Power Company and NRG Resource Recovery, Inc." (not dated) (Term: 1-1-1992 to 12-31-2001, automatically renewing for five year terms thereafter, unless terminated by six month written notice.)

4.  Lease and Agreement between Northern States Power Company and Minnesota Waste Processing Company, L.L.C. dated September 13, 1994.

5.  Lease and Agreement between Northern States Power Company and NRG Energy Inc. dated July 21, 1997.

6.  Short Term Coal Agreement for the Sale of Coal from Northern States Power Company (dba Xcel Energy, Seller) to NRG Energy Center-Rock Tenn LLC (Buyer) dated January 6, 2003.

7.  Letter Agreement between e prime and NRG Energy, Inc. dated on or about February 25, 2003.

8.  Agreement For Consulting Services Between NRG Energy, Inc. And Utility Engineering Corporation dated May 22, 2000.

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Schedule IX.A

(Intercompany Claims Owing to Xcel)

1. All amounts owed by NRG to Xcel in connection with various payments made by Xcel in connection with the Guarantees.

2. Third Quarter 2002 estimated tax payment made to NRG.

3. All amounts owed by NRG to Xcel in connection with the ASA.

4. All amounts owed by NRG to Xcel in connection with various Northern States Power Company and other agreements listed on Schedule VI.I.

5. All amounts owed by NRG to Xcel in connection with various engineering services.

6. All amounts owed by NRG to Xcel in connection with e prime.

7. All amounts owed by NRG to Xcel in connection with NSP-Wisconsin.

8. All amounts owed by NRG to Xcel in connection with PSCo.

9. All amounts, if any, owed by NRG to Xcel for NRG's own utility usage.

**PROVIDED AS PART OF SETTLEMENT
DISCUSSIONS; SUBJECT TO FEDERAL
RULE OF EVIDENCE 408 AND ALL
BANKRUPTCY AND STATE LAW EQUIVALENTS**

## Schedule IX.I

(NRG Finco Project Funding)